*Decisions will be entered under Rule 50.*

ARTHUR H. DuGRENIER, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 502–70. Filed August 29, 1972.

*Herbert P. Phillips*, for the petitioner.
*Alan I. Weinberg*, for the respondent.

STERRETT, *Judge:* Respondent determined a deficiency in petitioner's Federal income tax of $859.25 for the taxable year ended December 31, 1967.

The sole issue presented for adjudication is whether petitioner, Arthur H. DuGrenier, Inc., is entitled to deduct as an ordinary and necessary business expense under the provisions of section 162, I.R.C.

---

1954,[1] the payment of $190,000 in settlement of a suit instituted by the estate of a former shareholder.[2]

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation, together with the exhibits attached thereto, are incorporated herein by this reference.

Arthur H. DuGrenier, Inc. (hereinafter referred to as petitioner), is a corporation duly organized under the laws of the Commonwealth of Massachusetts. At all times material hereto its principal office was in Haverhill, Mass. Petitioner filed U.S. corporate income tax returns for the taxable years 1963 through 1967 with the district director of internal revenue at Boston, Mass.

From its inception in 1948 to January 23, 1964, petitioner's principal business activity was the manufacture of vending machines. For several years prior to the sale of its assets in January of 1964, petitioner's sales declined substantially due to the cigarette cancer scare. Petitioner sustained losses in 1962 and 1963 of $90,501 and $101,936, respectively. Petitioner's book value as of December 31, 1963, was $304,394.

Prior to May 11, 1962, petitioner's only two shareholders were Francis C. DuGrenier (hereinafter referred to as DuGrenier, Sr.) and Blanche E. Bouchard (hereinafter referred to as Bouchard). Each owned 50 percent of petitioner's outstanding stock. On May 11, 1962, Bouchard died. C. Earl Russell (hereinafter referred to as Russell) and Beatrice Cavan (hereinafter referred to as Cavan) were duly appointed executors of the decedent's estate. Russell was also the accountant for petitioner and had prepared its financial statements.

Shortly after Bouchard's death, negotiations were begun for the redemption by petitioner of the stock then owned by the estate and

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

[2] Petitioner made payment in settlement of the suit in 1966 and deducted a like amount as a business expense in that year. Its expenditures for such year, irrespective of the settlement payment, exceeded its income. Therefore, as permitted by sec. 6411, petitioner carried the entire resultant loss back to 1964, filing a request for refund from carryback of net operating loss for 1964, Form 1139. Respondent in compliance with sec. 6411(b) refunded the amount requested to petitioner. Subsequently respondent disallowed the 1966 deduction. However since petitioner carried over the unused net operating loss for 1966 to 1967 as a deduction, respondent issued a notice of deficiency for 1967.

With regard to 1964 though a deficiency was in fact determined and noted in the "explanation of adjustments" section of the notice of deficiency, because of the net operating loss refund allowed by respondent, respondent has not included such amount in his total deficiency determination. The reason for such exclusion is apparently respondent's reliance on sec. 6213(b)(2), wherein such amounts are treated as mathematical errors, if in fact such carryback is determined to be invalid, and therefore do not require the issuance of a notice of deficiency. We find respondent's procedural actions to be in complete compliance with the statute, but would only request that he make such actions more clearly known to the Court.

the payment of certain outstanding debts. The estate was represented by the coexecutors and a law firm and petitioner was represented by DuGrenier, Sr., his son, Francis G. DuGrenier (hereinafter referred to as DuGrenier, Jr.), and another law firm.

On December 4, 1963, the negotiations culminated with the execution of an agreement between petitioner and the estate. Such agreement provided for the payment of $160,000 in cash to the estate which represented:

| | |
|---|---:|
| Stock | $70,612.66 |
| Notes payable due Bouchard | 102,500.00 |
| Account payable due Bouchard | 15,576.32 |
| Subtotal | 188,688.98 |
| Less accounts receivable owed by Bouchard to three related corporations | 28,688.98 |
| Total | 160,000.00 |

At the time of sale Russell felt the estate received full value for the stock.

By letter dated December 13, 1963, the Seeburg Corp. (hereinafter referred to as Seeburg) expressed a willingness to buy, and petitioner expressed a willingness to sell, the assets of petitioner, including patents,[3] applications for patents, and inventions, for $1,100,000. On December 23, 1963, a purchase agreement was executed wherein petitioner and Seeburg agreed to the sale of petitioner's assets for $1,100,000.[4] On January 23, 1964, the sale was completed with the execution of a "General Bill of Sale and Assignment," an "Assignment," an "Assignment of Patents, Applications for Patents, and Rights to Pending Inventions," a "Clerk's Certification," a "Certificate," a covenant not to compete, an "Agreement Re Use of Name," and a "Waiver Pursuant to Purchase Agreement."

In April of 1963, prior to the sale of petitioner's assets to Seeburg, both DuGreniers, Sr. and Jr., met with Delbert W. Coleman (hereinafter referred to as Coleman), president and chairman of the board

---

[3] Bouchard, DuGrenier, Sr., and petitioner entered into agreements in April 1951, January 1955, and September 1958, wherein Bouchard and DuGrenier, Sr., agreed to lease to petitioner certain patents owned jointly by Bouchard and DuGrenier, Sr. On June 27, 1957, Bouchard and DuGrenier, Sr., entered into an agreement wherein if either party disposed of his stock interest in petitioner the remaining shareholder would purchase such patent interest for $1.

Petitioner contends that the sale of its assets to Seeburg for $1,100,000 included an allocation of approximately $243,000 which represented the value of the patents. It further contends that such amount was immediately thereafter passed through to DuGrenier, Sr.

If such be the true nature of the events we find it somewhat peculiar that Seeburg did not require DuGrenier, Sr., to personally transfer title since he was in fact the true owner of the patents.

[4] The final purchase price paid was $1,072,000. The discrepancy was due to certain adjustments which were required by agreement of the parties.

of Seeburg. The purpose of such meeting is unclear. On April 16, 1963, DuGrenier, Sr., forwarded to Coleman petitioner's financial statements for 1961.

From January 24, 1964, through sometime in 1966, petitioner was an inactive corporation not engaged in business activities which generated sales. During this period it investigated the possibility of acquiring other companies. Petitioner was never liquidated but rather has remained a legal entity up to the present.

As a result of the sale of petitioner's assets to Seeburg the estate filed a complaint in the U.S. District Court, for the District of Massachusetts, against DuGrenier, Sr., individually. Subsequently, it amended its cause of action and included petitioner as a codefendant. The complaint states in pertinent part as follows:

3. After their appointment as executors, the plaintiffs, on or about September 1, 1962 entered into negotiations with defendant relative to a complete disposition of decedent's interest with respect to DuGrenier, Inc.

In addition to Seven Hundred and Forty-Nine shares of the common stock of DuGrenier, Inc. and the joint interest in said patents, decedent held demand notes in the amount of $102,500 on account of loans made to the corporation, and was also owed $15,576.12 by the corporation for interest, royalties and salary.

4. In the course of the negotiations to dispose of decedent's interest, the plaintiffs with the knowledge and cooperation of the defendant examined corporate financial statements and data which indicated and which defendant represented as indicating that a liquidation or forced sale of the assets of DuGrenier, Inc. and the patents would realize less for decedent's interest than the $160,000 which he subsequently offered. The defendant represented that a sale of the assets could only be accomplished by such a forced liquidation, and that such forced liquidation was the only alternative to his offer.

5. Relying upon these representations, as defendant intended them to rely, the plaintiffs on December 16, 1963 disposed of decedent's interest by transferring the decedent's shares and delivering her demand notes to DuGrenier, Inc. in return for $160,000 and an exchange of mutual releases. The defendant was thus left as sole stockholder in DuGreiner, Inc. with a right to sole ownership of the aforesaid patents.

6. Subsequent to such disposition of decedent's interest and payment therefor, the plaintiffs learned that the foregoing representations were false and known by the defendant to be false, and that defendant had thereby intended to and did deceive and defraud the plaintiffs and had violated his duty under the circumstances to make a full and complete disclosure to the plaintiffs of all material facts affecting the value of decedent's interest.

7. In truth and in fact, and in breach of such duty, the defendant wilfully and fraudulently concealed from the plaintiffs and failed to disclose that he was negotiating for a sale of the assets of DuGrenier, Inc. and of said patents to Seeburg Corporation and that such negotiations had so far progressed that defendant knew or had reason to believe that it was probable that such sale to Seeburg Corporation would be consummated and for a price far in excess of the liquidation basis upon which the plaintiffs had relied for a disposition of de-

cedent's interest as a result of the foregoing fraudulent representation and such nondisclosure.

8. Within a few weeks after the decedent's interest was thus obtained from the plaintiffs for $160,000 as aforesaid, the defendant, as sole stockholder and owner of the patents, consummated the sale of the assets of DuGrenier, Inc. and of said patents to Seeburg Corporation for such excess price in accordance with his prior undisclosed negotiations with Seeburg Corporation.

9. Except for the foregoing false and fraudulent representations and the defendant's failure to disclose that he was negotiating for a sale of the assets of DuGrenier, Inc. and of said patents to Seeburg Corporation and that such negotiations had so far progressed that defendant knew or had reason to believe that it was probable that such sale to Seeburg Corporation would be consummated and for such excess price, plaintiffs would not have agreed to the transfer and disposition of decedent's interest for $160,000, but would have retained said interest in order to participate in and receive decedent's pro rata share of the price paid by Seeburg for the assets of DuGrenier, Inc. and for said patents. The fair value of decedent's interest was thus at least $400,000 more than the price received by plaintiffs.

10. By reason of the facts set forth above, the plaintiffs have been damaged by the defendant to the amount of $400,000.

Wherefore, plaintiffs demand judgment against the defendant in the sum of $400,000 with interest and costs.[5]

DuGrenier, Sr., and petitioner herein denied all allegations raised by the executors' complaint.

A trial was never held on the merits of the estate's complaint. On January 17, 1966, a "Stipulation for Entry of Judgment" was filed by the estate and defendants, DuGrenier, Sr., and petitioner. It provided for the dismissal of DuGrenier, Sr., as a defendant and the recovery of the estate of $190,000. On January 19, 1966, a judgment was entered dismissing the action and awarding the estate $190,000. During this period a release was executed by the executors which discharged the defendants from any further liability on account of:

(1) any matter relating to the sale by C. Earl Russell and Beatrice Cavan, as Executors of the will of Blanche E. Bouchard, late of Haverhill, Massachusetts, to Arthur H. DuGrenier, Inc. of seven hundred and forty nine (749) shares of the common stock of Arthur H. DuGrenier, Inc., pursuant to the "Agreement" between the said Executors and the said corporation dated as of December 4, 1963, including, but not limited to, the said sale itself; (2) any matter relating to the sale by Arthur H. DuGrenier, Inc. of certain of its assets to The Seeburg Corporation, a Delaware corporation, pursuant to the "Purchase Agreement" between the said two parties, dated as of December 23, 1963; * * *

In addition to the cause of action brought by the executors, four other suits were filed against petitioner between 1964 and 1966. The damages sought in these cases totaled over $110,000,[6] bringing the total

---

[5] In addition to the above-quoted language the executors alleged three additional causes of action. They also motioned for equitable attachment, which was granted.

[6] One of the suits noted above involved a deficiency in income tax. Such case was settled prior to trial in the Tax Court.

damages from all suits pending against petitioner to over $510,000. Petitioner's book value for the years ended 1964 and 1965 was $460,045 and $456,743, respectively.

On its 1966 U.S. corporate income tax return petitioner deducted the payment of the $190,000 as an ordinary and necessary business expense. Petitioner's 1966 return reflected a net operating loss which was carried back to 1964 and forward to 1967.

OPINION

Prior to May 11, 1962, petitioner's sole shareholders were Du-Grenier, Sr., and Bouchard. On May 11, 1962, Bouchard died. Shortly thereafter negotiations were begun for the redemption by petitioner of the stock then owned by the estate and the payment of certain outstanding debts. On December 4, 1963, the negotiations culminated with the execution of an agreement which provided for the payment by petitioner of $160,000 to the estate. Approximately $70,000 of this amount represented the value of the stock held by the estate in petitioner. Shortly thereafter, on December 13, 1963, Seeburg expressed a willingness to buy the assets of petitioner for $1,100,000. On December 23, 1963, a purchase agreement was executed for the purchase and sale of petitioner's assets at the above-noted price. As a result of this sale the Bouchard estate filed a complaint in the U.S. District Court against DuGrenier, Sr., and petitioner alleging the fraudulent concealment of certain facts relevant to the value of petitioner's stock held by the estate. The estate asserted that the stock redeemed by petitioner was worth an additional $400,000. Prior to trial the parties entered into a settlement wherein petitioner paid $190,000 to the estate in return for the execution by the estate of a release barring any further action by the estate with regard to the redemption of the stock. The sole issue presented for determination relates to whether the payment by petitioner to the Bouchard estate in settlement of the suit is deductible as an ordinary and necessary business expense under the provisions of section 162, which states in part:

SEC. 162. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *.[7]

---

[7] Sec. 1.162–1. Business expenses.

(a) In general. Business expenses deductible from gross income include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business * * *. No such item shall be included in business expenses, however, to the extent that it is used by the taxpayer in computing the cost of property included in its inventory or used in determining the gain or loss basis of its plant, equipment, or other property.

or is a nondeductible capital expenditure within the purview of section 263, which provides, in part:

SEC. 263. CAPITAL EXPENDITURES.

   (a) GENERAL RULE.—No deduction shall be allowed for—

      (1) Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate.[8]

In recent years the courts in distinguishing between certain ordinary and necessary business expenses and capital expenditures have applied what is commonly referred to as the origin-of-the-claim test as first enunciated in *United States* v. *Gilmore*, 372 U.S. 39 (1963). See *Woodward* v. *Commissioner*, 397 U.S. 572 (1970); *United States* v. *Hilton Hotels Corp.*, 397 U.S. 580 (1970); *Ransburg* v. *United States*, 440 F. 2d 1140 (C.A. 10, 1971); *Anchor Coupling Co.* v. *United States*, 427 F. 2d 429 (C.A. 7, 1970); *Stass Reed*, 55 T.C. 32 (1970).

In *Gilmore*, the Supreme Court, in attempting to distinguish between business and personal expenses indicated that it was not the "primary purpose" which determined the nature of an expense, but rather the origin and character of such expense. The Court stated:

For these reasons, we resolve the conflict * * * in favor of the view that the origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortunes of the taxpayer, is the controlling basic test of whether the expense was "business" or "personal" and hence whether it is deductible or not. * * * [372 U.S. at 49.]

Several years later in *Woodward*, the Supreme Court applied this same origin-of-the-claim test in ascertaining whether appraisal litigation expenses were capital expenditures incurred with respect to the acquisition or disposition of a capital asset. The Court therein noted:

In our view * * * litigation expenses involves the simpler inquiry whether the origin of the claim litigated is in the process of acquisition itself. [397 U.S. at 577.]

Shortly thereafter in *Anchor Coupling Co.*, the Court of Appeals for the Seventh Circuit, analyzing the *Gilmore* and *Woodward* decisions in an attempt to determine the character of a settlement payment made to protect a party's interest in property, stated:

However, the Court did not intimate the extent to which the primary purpose test, as applied to costs incurred in protecting ownership, has been rejected by the adoption of an objective standard of deductibility in *Gilmore* and *Woodward*. We are convinced that the considerations which prompted the Court to an-

---

   8 Sec. 1.263(a)–2. Examples of capital expenditures.

    *       *       *       *       *       *       *

   (a) The cost of acquisition, construction, or erection of buildings, machinery and equipment, furniture and fixtures, and similar property having a useful life substantially beyond the taxable year.

    *       *       *       *       *       *       *

   (c) The cost of defending or perfecting title to property.

nounce such a test in these cases also impel us to fashion a similar test for determining whether the settlement payment in this case is a business expense or a capital expenditure.

In so doing we rely particularly on *Gilmore*. Taxpayer argues that *Gilmore* is inapplicable because we are asked here to determine whether a settlement ' constitutes an ordinary and necessary business expense or a capital outlay and not whether a payment is a deductible business expense or a nondeductible personal expense. We disagree. Although the two questions are admittedly different, substantially the same problems arise in each determination. Thus in both cases the court must determine the tax consequences of monetary outlays made in connection with contesting a claim on the taxpayer's assets. Consideration of the taxpayer's motive and the consequences of his failure to make a payment or to incur an expense create the same problems in both cases. [427 F. 2d at 432–433.]

It is apparent from the above-cited cases that the origin-of-the-claim test will characterize an expense as a capital expenditure if such expense is incidental to either the purchase or sale of an asset or is made to protect one's interest in an asset, regardless of the taxpayer's motives in making such payment. Such doctrine is clearly applicable to the present factual situation and it necessitates the characterization of the payment presently in issue as a capital expenditure. The origin of the Bouchard estate's claim was founded on the sale of stock. Though the catalyst for this action may have been the subsequent sale by petitioner to Seeburg, this does not alter the basic fact that the estate was attempting to obtain what it deemed to be the full value for the stock transferred. The settlement payment made by petitioner was therefore nothing more than an additional portion of the purchase price which simultaneously clarified and validated its title to the stock and underlying assets. We find little substantive difference between this situation and that presented in the cases noted above.

Further, in *Stass Reed*, this Court faced with the question of the character of legal expenses incurred by a party in bringing suit noted: "Without considering the potential consequences of the lawsuit, the suit itself had its roots in the acquisition process * * * [55 T.C. at 42]." We find such language equally applicable to the defendant in such action who attempts to extricate himself from the suit by making payment in settlement of the cause of action.

Furthermore, in addition to the origin-of-the-claim test applied above we find the theory as expounded in *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952), to be equally applicable. There the Supreme Court in characterizing payments made incidental to, but several years after, the initial transaction noted:

It is contended, however, that this payment which would have been a capital transaction in 1940 was transformed into an ordinary business transaction in 1944 because of the well-established principle that each taxable year is a separate unit for tax accounting purposes. *United States* v. *Lewis*, 340 U.S.

590; *North American Oil* v. *Burnet*, 286 U.S. 417. But this principle is not breached by considering all the 1937–1944 liquidation transaction events in order properly to classify the nature of the 1944 loss for tax purposes. Such an examination is not an attempt to reopen and readjust the 1937 to 1940 tax returns, an action that would be inconsistent with the annual tax accounting principle.

It is manifest to this Court that, since the settlement payment was nothing more than an additional portion of the purchase price paid several years later, the *Arrowsmith* decision permits us to look back to the sale year and characterize such payment as a capital expenditure. *Rees Blow Pipe Manufacturing Co.*, 41 T.C. 598, affirmed per curiam 342 F. 2d 990 (C.A. 9, 1965) ; *Estate of James M. Shannonhouse*, 21 T.C. 422 (1953).[9]

This fact, that the payment was in reality attributable to a redetermined purchase price and integrally related thereto, serves to distinguish the case from *William L. Mitchell*, 52 T.C. 170 (1969), revd. 428 F. 2d 259 (C.A. 6, 1970), and *James E. Anderson*, 56 T.C. 1370 (1971), on appeal (C.A. 7, Dec. 23, 1971), wherein the payments in issue were deemed to have been paid out of the taxpayers' concern for their reputation as businessmen.

Petitioner asserts however that an allocation should be made. That is, it requests the Court to find that a portion of the settlement was in fact a business expense.

We are prevented from doing so. In *E. I. duPont de Nemours & Co.* v. *United States*, 432 F. 2d 1052, 1059 (C.A. 3, 1970), the court noted that "In the present case, however, the taxpayer made no attempt at such a breakdown. With respect to the entire expenditure, therefore, we hold that the taxpayer failed to meet its burden of proving deductibility under section 162(a)." See *Clark Oil & Refining Corp.* v. *United States*, 326 F. Supp. 145, 150 (E.D. Wis. 1971) ; *Stass Reed*, *supra* at 41. Compare *DeMink* v. *United States*, 448 F. 2d 867 (C.A. 9, 1971).

Upon an examination of the entire record we conclude that the petitioner's settlement payment is a capital expenditure and therefore not deductible.

*Decision will be entered for the respondent.*

---

[9] In *Arrowsmith*, *Rees Blow Pipe*, and *Shannonhouse*, the courts disallowed a business expense under sec. 162 and an ordinary loss under sec. 165, but they granted the taxpayer a capital loss because the year of the transaction was closed and the additional expense could not be added to basis. To have prohibited any loss would in effect have caused the taxpayer to be subject to a double tax, i.e., the payment of additional funds without a commensurate increase in basis.

In the instant case we have classified the additional purchase payment as a capital expenditure though the year of the redemption is closed. The reason is that we are not here concerned with a sale, but rather, the redemption by a corporation of its own stock. Therefore, there is no question of a double tax since a corporation recognizes no gain in dealing in its own stock.