ENTWICKLUNGS UND FINANZIERUNGS A.G., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6132–75.   Filed August 29, 1977.

*William W. Oliver*, for the petitioner.
*Thomas L. Kummer*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies of $11,757.56 and $72,881.30 in petitioner's Federal income tax for 1970 and 1971, respectively. Respondent has conceded the deficiency for 1971 and two of the adjustments made with respect to 1970 in the statutory notice of deficiencies. Two other adjustments made with respect to 1970 in the statutory notice were not placed in issue by petitioner. Consequently, the sole issue presented for decision is whether a $300,000 liability incurred by petitioner in 1970 as the result of a lawsuit settlement was an ordinary and necessary business expense or a nondeductible capital expenditure.[1]

---

[1] Deducting the $300,000 settlement liability from ordinary income, petitioner computed a net operating loss of $295,109.37 for 1970. On Aug. 10, 1972, petitioner filed a claim for refund of Federal income tax paid for 1967, based on a net operating loss carryback from 1970. The statutory notice of deficiencies issued to petitioner for taxable years 1970 and 1971 contains the following statement:

"In making this determination of your income tax liability, careful consideration has been given to your claim for refund filed on August 10, 1972 with respect to the year 1967.

"If a petition to the Tax Court of the United States is filed against the deficiency proposed herein, the issue set forth in your claim for refund should be made a part of the petition to be considered by the Tax Court in any redetermination of your tax liability. If a petition is not filed, the claim for refund will be disallowed and official notice will be issued by certified mail in accordance with Section 6532(a)(1) of the Internal Revenue Code."

Accordingly, petitioner cited as error in its petition respondent's failure to allow its claim for refund of income tax paid for 1967. On brief both parties made reference to the claim for refund, but neither sought any kind of specific ruling with respect thereto. The reason for the latter is no doubt due to the fact that we have no jurisdiction with respect to taxable year 1967. Sec. 6214(b), I.R.C. 1954; see *Commissioner v. Gooch Milling & Elevator Co.*, 320 U.S. 418 (1943); *LTV Corp. v. Commissioner*, 64 T.C. 589 (1975). Under these circumstances, we decline to speculate on the parties' reasons for bringing the refund claim to our attention. Although respondent's disposition of the claim may well be affected by our decision herein, we do not express any opinion with respect to its merits.

## FINDINGS OF FACT

Petitioner is a corporation organized under the laws of Liechtenstein. It is an accrual method taxpayer reporting on the calendar year. Petitioner filed its Federal income tax return for 1970 with the Director of International Operations, Internal Revenue Service, Washington, D.C. Petitioner did not file a Federal income tax return for 1971.

Sometime prior to 1960, an engineer and inventor named Don Forse formed an Indiana corporation known as Forse, Inc., to engage in the manufacture and sale of commercial laundry and drycleaning equipment designed by him, or others collaborating with him. In 1960 Don Forse formed another Indiana corporation, Forco, Inc. (hereinafter Forco), to perform the manufacturing functions of the business. Forco proceeded to establish its manufacturing facility at Morristown, Tenn.

On July 14, 1961, Don Forse entered into a royalty agreement granting Forco an exclusive license to manufacture and sell the laundry and drycleaning equipment covered by patents issued to him. Under the agreement and modifications thereof, Forco was entitled to an exclusive license on any improvements or new patents obtained by Don Forse for laundry and drycleaning machinery. This license agreement was to continue until the expiration of the last patent and improvements thereon covered by the agreement, subject to a right by either party to terminate upon specified conditions not pertinent here. On the same day, Forse, Inc., transferred to Forco all the manufacturing equipment used by it during May 1961 in the manufacture of laundry and drycleaning equipment.

Also on July 14, 1961, Forse, Inc., and Forco entered into an exclusive sales agreement with respect to the laundry and drycleaning equipment to be manufactured by Forco. Forco agreed that Forse, Inc., would be its sole sales representative for marketing such equipment, and Forse, Inc., agreed to purchase all its sales needs from Forco. The exclusivity of the arrangement was conditioned upon Forse, Inc.'s purchase of average minimum monthly dollar amounts of equipment and upon Forco's ability to manufacture in sufficient quantities to satisfy Forse, Inc.'s sales needs. Forse, Inc., also agreed to

perform research and development on the product line, with the findings and results thereof to be presented to Forco.

Sometime after the execution of these agreements, Forse, Inc., changed its name to Cleanamation, Inc. (hereinafter Cleanamation). On June 22, 1962, a new sales agreement was entered into by Forco and Cleanamation. The terms of the new agreement were similar to those contained in the prior agreement between Forco and Forse, Inc., Forco agreeing that absent breach of the contract Cleanamation would be its sole sales representative in the United States. The agreement was for a term of 5 years from its date and was to be automatically renewed for a like period absent 90-days written notice prior to its expiration of either party's desire to terminate the agreement. The parties also contracted that Cleanamation would maintain an adequate parts and service organization to service the product line.

Petitioner was incorporated on April 11, 1963, under the laws of Liechtenstein.[2] The major reason for its formation was to be a sales organization outside the United States and Canada for the laundry and drycleaning equipment manufactured by Forco. Max Suite, who indirectly held a minority stock interest in Forco, acquired 49 percent of petitioner's voting stock. The remainder of petitioner's stock was held by a number of other individuals, including Don Forse. Petitioner is not and never has been a controlled foreign corporation.

In 1964 petitioner purchased the assets of Forco, including the manufacturing facility at Morristown, Tenn. Petitioner succeeded to Forco's rights to certain patents under the agreement with Don Forse, and Cleanamation continued to be the exclusive sales representative in the United States and Canada for the laundry and drycleaning equipment manufactured by petitioner.

At Cleanamation's request, in 1966, petitioner expanded its production capacity by enlarging its physical plant at Morristown, Tenn., and by establishing a manufacturing facility in Canada. In return the minimum amount of monthly purchases necessary for Cleanamation to retain its exclusive sales representative status was increased.

---

[2] Petitioner was known as Forschungs & Entwicklungs Aktiengesellschaft, d.b.a. Forenta A.G., until July 8, 1971, when its name was changed to Entwicklungs & Finanzierungs A.G.

At about the same time petitioner's physical expansion was completed, technological advances in the garment industry, namely the advent of permanent press and similar fabrics wearable without the need for commercial laundering, resulted in a decreased demand for the equipment manufactured by petitioner and sold by Cleanamation. Petitioner found itself with a severe cash shortage because of the expansion-related fixed costs and the unanticipated adverse market conditions.

In 1967 or 1968, Max Suite, representing petitioner, and Don Forse, representing Cleanamation, negotiated to sell both corporations as a package to Dover Elevators, Inc. However, Cleanamation withdrew from the negotiations, and because Dover was not interested in purchasing either corporation separately, no sale was consummated.

By November 29, 1968, Cleanamation was in default on its minimum purchases obligation to petitioner and both parties agreed that the sales contract between them was thereby canceled and annulled. Petitioner informed Cleanamation that in order to combat its critical financial situation it intended to begin selling all its own rebuilt equipment (but not under the Forse-Cleanamation label), and the parties entered into a short-term sales agreement for the period ending February 28, 1969.

On February 1, 1969, petitioner and Cleanamation executed a 1-year sales agreement, automatically renewable for like periods absent advance written notice by either party of its desire to terminate, on terms similar to the earlier sales agreements between them. The contract provided for certain minimum purchases by Cleanamation, which if met, obligated petitioner to sell its equipment to no other buyer in the United States.

Also during early 1969, petitioner conducted negotiations aimed toward listing the stock of Forenta, Ltd., its wholly owned Canadian subsidiary, on the Canadian Stock Exchange. A certified audit of Forenta, Ltd., was completed in mid-summer 1969, but no public offering of Forenta, Ltd., stock was ever made.

By mid-1969 Cleanamation was again not meeting its minimum purchases requirement under the latest sales agreement. At about this same time, mid-1969, negotiations

concerning petitioner's offer to purchase Cleanamation's assets for about $1 million in installments were terminated without agreement. As a result of these last two developments, petitioner began selling its products to Cleanamation on a nonexclusive basis and determined to launch its own marketing force in the United States.

One of the reasons petitioner decided to organize its own sales force was that it felt Cleanamation was not adequately covering the market; another reason was that, recognizing the market conditions generally, petitioner needed the additional margin to be gained by eliminating the middleman—Cleanamation. Petitioner continued to sell to Cleanamation, as a private label account, however, because it needed those sales in addition to ones generated by its own marketing organization.

Despite correspondence between top level management representatives of petitioner and Cleanamation, referring to hopes for a friendly and cooperative attitude in their new relationship, disruptive competition developed between the sales force of the two companies. Distributors being called on by both companies expressed their displeasure at being drawn into the internal problems of petitioner and Cleanamation, and some customers began to defect to other competitors. Discussions failed to resolve the disruptive behavior at the sales level. Each company felt that the major fault lay with the other. Consequently, in December 1969 Cleanamation filed two lawsuits against petitioner, one in Tipton Circuit Court, Tipton County, Ind., and one in the United States District Court for the Southern District of Indiana.

Cleanamation sought both monetary and injunctive relief in the State court suit. Its complaint alleged the basic facts regarding the relationship between the two companies as heretofore set forth, and further alleged as follows: that in June 1969 petitioner attempted to purchase Cleanamation's assets, but such attempt was unsuccessful; that at the time negotiations were terminated, petitioner canceled the existing exclusive sales agreement and subsequently indicated its intention to acquire Cleanamation's business by the elimination of Cleanamation from the competitive position it had theretofore enjoyed; that the nonexclusive sales arrangement greatly increased Cleanamation's costs of purchasing peti-

tioner's equipment; that because of the prior relationship between the two companies, petitioner had peculiar access to information about Cleanamation's internal operations, and in setting up its own sales distribution organization in the United States petitioner unfairly exploited same by enticing Cleanamation sales personnel into its own employ and by soliciting jobbers, distributors, and outlets created by Cleanamation, as well as ultimate consumers, in violation of an agreement not to do so; that whereas Cleanamation had previously realized a profit in excess of $100,000 per year, due to the unfair actions of petitioner it was currently operating at a loss and would continue to do so; that in addition to these unfair actions, in its own sales promotion petitioner wrongfully used printed literature showing Cleanamation's name and trademark, used model numbers established by Cleanamation, and used New York State Bureau of Standards and Appeals' numbers owned by Cleanamation; that petitioner had made malicious misrepresentations about Cleanamation; and that by these intentional acts and interferences petitioner intended to, and did, cause Cleanamation great damage through loss of sales and profits, all to the final end that petitioner could take over Cleanamation's sales potential and drive Cleanamation out of business. For these wrongful actions Cleanamation sought actual damages of $1 million and punitive damages of $500,000. Cleanamation also sought an injunction prohibiting petitioner from continuing the aforementioned conduct.

The last ground for relief contained in the complaint was petitioner's alleged conversion to its own use of certain tools, dies, molds, and blueprints supplied to petitioner by Cleanamation pursuant to the product development terms of the prior exclusive sales agreements. Cleanamation asserted entitlement to be compensated for the value of those items, allegedly $125,000.

The Federal court suit was based on alleged violations of the Federal antitrust laws. The complaint set forth allegations similar to those contained in the complaint filed in State court, and further alleged that petitioner and certain of Cleanamation's former sales employees had engaged in a contract, combination, or conspiracy in restraint of trade or commerce among the several States. The complaint alleged

that petitioner's wrongful acts were pursuant to such contract, combination, or conspiracy, that they were intended to drive Cleanamation out of business by depriving it of its previously enjoyed competitive position, and that Cleanamation had suffered damages in the amount of $1 million. Cleanamation sought triple damages of $3 million and attorney fees of $300,000.

Petitioner felt that the lawsuits were without merit, but it did not consider them frivolous. Outside counsel was retained for the antitrust suit, and petitioner considered its chances of winning that case to be better than its chances in the State court suit. Petitioner estimated its litigation expenses, if the cases proceeded to trial, would be between $185,000 and $250,000. Particularly disconcerting to petitioner was the effect the lawsuits were having on its business operations; in an already declining market, valuable management time was being taken up with matters concerning the litigation.

On May 20, 1970, two documents were executed by and among petitioner, Cleanamation, and Don Forse: one was entitled "Compromise Settlement Agreement," the other "Inventory Purchase Agreement." The compromise settlement agreement noted the pendency of the aforementioned lawsuits and recited a desire by the parties thereto to settle and set at rest forever all matters of dispute among them. It provided that petitioner would pay to Cleanamation $300,000 and described the terms and manner of payment. It further provided that the payment of such moneys was "wholly in the nature of a compromise settlement," petitioner expressly disclaiming any liability to Cleanamation. Petitioner also agreed to release any and all claims and causes of action that it might have against Cleanamation arising out of their prior relationship. Cleanamation agreed to dismiss with prejudice the pending lawsuits against petitioner, to release any and all other claims that it might have against petitioner arising out of their prior relationship, to release and convey to petitioner any and all items claimed by it in the pending lawsuits, and to refrain from interfering with petitioner's business operations. Don Forse similarly agreed to release petitioner from any claims that he might have individually, expressly excepting any that might arise under certain royalty and stock purchase agreements with petitioner.

Pursuant to the inventory purchase agreement petitioner agreed to purchase all of Cleanamation's inventory of laundry and drycleaning equipment and parts, new and used, as is, possession to change hands where located, for $150,000. The principal sales price was subject to downward adjustment, however, in the event that physical inventory revealed a book value, i.e., acquisition cost to Cleanamation, of less than $250,000. As part of the consideration for the inventory purchase, Cleanamation and Don Forse agreed to assign to petitioner the registration of trademarks and copyrights, and trade names, then owned by Cleanamation. Cleanamation and Don Forse also agreed not to compete with petitioner in North America for 10 years in the development, manufacture, or sale of equipment useable for textile maintenance or manufacture, with certain exceptions. This covenant not to compete, however, was not bargained for in the negotiations over the amount of money petitioner would have to pay Cleanamation, but was more or less added as an afterthought when the final agreements were being drafted. On May 25, 1970, Cleanamation voluntarily dismissed its lawsuits against petitioner, and after mid-1970, it no longer engaged in the laundry and drycleaning equipment business.

Physical inventory of the equipment and parts passing to petitioner revealed a book value of $255,150.69. Many of the items had been purchased from petitioner, however, and Cleanamation's book value reflected petitioner's normal markup. Also, included in the inventory were some items that were sent to the junk pile rather than transferred to Morristown, some prototype experimental machines and some used machines that had been taken in on trade, and a considerable amount of obsolete spare parts. About 40 percent of the so-called inventory was unmarketable machines and parts. This inventory as held by Cleanamation prior to sale was encumbered with a security interest in favor of some lender. Of the trademarks, copyrights, and trade names passing to petitioner under the inventory purchase agreement, petitioner used only a single copyright, and its use was not extensive. Petitioner also may have hired one of cleanamation's ex-salesmen after May 20, 1970.

Immediately after the inventory purchase, petitioner transferred those items and all other assets at the Morristown

plant to a wholly owned subsidiary, Forenta, Inc. Forenta, Inc., was incorporated in Delaware on April 1, 1970, in order to facilitate petitioner's activities in the United States. Shortly after and in conjunction with the transfer of assets, petitioner transferred all the stock of Forenta, Inc., to Forenta, Ltd., petitioner's wholly owned Canadian subsidiary.

The $150,000 liability incurred under the inventory purchase agreement was initially satisfied by issuance of a promissory note and ultimately discharged by payment in cash prior to August 31, 1970. Fifty thousand dollars of the liability incurred under the compromise settlement agreement was discharged by issuance of a credit memo to Cleanamation. Pursuant to the terms of the agreement, payment of the $250,000 balance was to be made in quarterly installments, with 6-percent interest on the unpaid balance, in amounts equal to a certain percentage of petitioner's sales.

In November 1970 petitioner made a quarterly payment, including interest computed on a balance of $250,000. By letter dated November 10, 1970, Cleanamation notified petitioner that additional interest of $129.32 was due on an unpaid balance of $256,513.12. The $6,513.12 represented the cost of additional inventory, discovered after the initial inventory transaction was completed, that either petitioner or Forenta, Inc., agreed to purchase but for financial reasons was unable to pay for immediately. Petitioner considered Cleanamation's adding the excess inventory price to the outstanding balance under the settlement agreement and using the total as a basis for computing interest, improper. The record fails to show how this dispute was resolved, if it ever was, but after November petitioner made no further quarterly payments. The balance of the liability was ultimately assumed by Harriman Manufacturing Co. on July 8, 1971, in a transaction whereby that corporation purchased petitioner's stock in Forenta, Ltd.

In exchange for the Forenta, Ltd., stock, petitioner received shares of stock in Super-Sonics Properties, Inc. The rather complex details of the transaction are not pertinent to the only issue remaining in this case, but petitioner's Super-Sonics stock was placed in escrow and petitioner's right to sell the stock was restricted under an investment letter agree-

ment. On June 8, 1973, Super-Sonics was adjudicated bankrupt.

On its 1970 Federal income tax return, petitioner claimed a deduction for $300,000 on account of the lawsuit settlement. Respondent disallowed the deduction in his statutory notice of deficiencies on the basis that petitioner failed to establish that the amount constituted an ordinary and necessary business expense.

OPINION

The only issue for decision is whether petitioner's $300,000 settlement liability was an ordinary and necessary business expense deductible from current income under section 162(a) or a nondeductible capital outlay under section 263.[3] The origin and character of the claim with respect to which a settlement liability was incurred governs the tax character of that liability. *Anchor Coupling Co. v. United States,* 427 F.2d 429 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971); *Clark Oil & Refining Corp. v. United States,* 473 F.2d 1217 (7th Cir. 1973); *Eisler v. Commissioner,* 59 T.C. 634 (1973); *Yates Industries, Inc. v. Commissioner,* 58 T.C. 961 (1972); *Arthur H. DuGrenier, Inc. v. Commissioner,* 58 T.C. 931 (1972). Petitioner's contention that the origin of the claim test is not applicable to this case because the lawsuits settled did not involve the acquisition of or title to any capital assets merely begs the question that the test was designed to answer. Contrary to petitioner's description of the test, however,

the "origin-of-the-claim" rule does not contemplate a mechanical search for the first in the chain of events which led to the litigation but, rather, requires an examination of all the facts. The inquiry is directed to the ascertainment of the "kind of transaction" out of which the litigation arose. Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy. [Citation omitted; fn. ref. omitted.]

*Boagni v. Commissioner,* 59 T.C. 708, 713 (1973). Accord, *Newark Morning Ledger Co. v. United States,* 416 F.Supp. 689 (D. N.J. 1975), affd. 539 F.2d 929 (3d Cir. 1976). If this examination reveals that the settlement payment was made

---

[3] All statutory references are to the Internal Revenue Code of 1954, as amended.

to resolve a claim which arose in the process of acquisition of a capital asset or to extinguish a claim involving ownership rights to a capital asset, regardless of the taxpayer's subjective motivation for agreeing to make the payment, it constitutes a capital expenditure. *Anchor Coupling Co. v. United States, supra; Clark Oil & Refinery Corp. v. United States, supra.* Consequently, petitioner's reliance upon evidence of its reasons for incurring the settlement liability, principally the potentially disastrous effect on its business operations if the suits proceeded to trial, is misplaced.

Respondent contends that the two lawsuits filed by Cleanamation were merely a subterfuge to "establish the terms under which petitioner could acquire Cleanamation's part of the business." He takes the position that the true settlement amount was the entire $450,000 liability incurred by petitioner under the two documents executed on May 20, 1970, and submits "that the settlement of these lawsuits with the promise of payment to Cleanamation of $450,000, thereby eliminating Cleanamation from a competitive position, giving the petitioner clear title to the tools, dies, molds, and blueprints claimed by Cleanamation, giving petitioner the right to use Cleanamation trade names, model numbers, literature, New York State Bureau of Standard and Appeal's [sic] Numbers, and giving to petitioner $255,130.69 of inventory can be characterized as nothing other than a capital expenditure required to be treated under Code §263." Petitioner does not strongly object to respondent's assertion that the true settlement liability was $450,000, but it submits that had the terms of the two agreements been incorporated into a single document, there would still be an issue of how to allocate the total liability between the purchase of assets and the compromise settlement of the claims asserted in the lawsuits. Petitioner contends that Cleanamation and it made the necessary allocation when they executed the two separate documents, and it vigorously disputes respondent's characterization of the settlement amount as simply the purchase price it had to pay to acquire Cleanamation. Reality requires us to consider the entire $450,000 as the settlement liability, but we also agree with petitioner that an allocation is appropriate if the settlement actually involved more than "a sale transaction." *DeMink v. United States*, 448 F.2d 867 (9th

Cir. 1971). Accordingly, our first task is to determine the claim or claims which were the actual basis for petitioner's agreement to pay Cleanamation $300,000 of the total settlement liability. *Eisler v. Commissioner, supra.* Cf. *Seay v. Commissioner,* 58 T.C. 32 (1972) (involved whether a settlement payment was excludable from gross income).

Respondent submits *Clark Oil & Refining Corp. v. United States, supra,* as the best authority supporting his view of this case. In *Clark Oil* the taxpayer sought a deduction for $297,500 of a $322,500 payment made in settlement of a lawsuit seeking an injunction and damages for alleged nuisances and trespasses committed by the taxpayer. Pursuant to the settlement agreement Clark Oil acquired the real property on which the nuisances and trespasses were allegedly committed. It treated $25,000 of the gross payment as attributable to purchase of the property and the remainder it sought to deduct as an ordinary and necessary business expense.

In holding that the entire settlement payment constituted a capital expenditure, the court rejected Clark Oil's reliance upon the origin and character of the claims asserted against it in the lawsuit complaint. The evidence established that the dispute actually settled by the $322,500 payment was the purchase price of the property. Clark Oil had attempted to purchase the property for several years but had been unable to agree with the owner on a suitable purchase price. The tort litigation represented a serious threat to the successful operation of Clark Oil's business, not because of damage that it had done, however, but because the State trial judge indicated his inclination to grant the injunction sought in the lawsuit. The settlement amount was arrived at by submitting to binding arbitration the question of a fair purchase price. The arbitration agreement listed the items to be considered in determining the purchase price, and the items listed did not include any damage that Clark Oil might have caused by the tortious acts alleged in the lawsuit. Although the tort action was dismissed as part of the settlement agreement, no portion of the settlement amount related directly to the claims asserted in the complaint. The claim actually resolved by the settlement amount having been the purchase price of a capital asset, its origin was in the process of acquisition, and

the entire settlement payment was properly considered a capital expenditure.[4] Accord, *Yates Industries, Inc. v. Commissioner, supra.* Thus, *Clark Oil* tells us the proper tax treatment of a payment made to acquire a capital asset in the context of litigation settlement, but it is of less help in resolving the factual question now under consideration.

Nevertheless, respondent points to several items in his effort to show the factual similarity between this case and *Clark Oil:* (1) Petitioner and Cleanamation were once a single corporation engaged in both the manufacture and distribution of laundry and drycleaning equipment; (2) petitioner and Cleanamation attempted to sell themselves as a package to Dover Elevators; (3) petitioner offered to purchase Cleanamation's assets; (4) petitioner attempted to list the stock of Forenta, Ltd., on the Canadian Stock Exchange; (5) to settle the lawsuits filed by Cleanamation, in exchange for $450,000, Cleanamation transferred to petitioner all of its tangible and intangible property connected with its laundry and drycleaning equipment operation and got out of the business; and (6) after the settlement, petitioner sold its laundry and drycleaning business to Harriman Manufacturing Co. Respondent finds these facts conclusive evidence that the lawsuits were merely "the catalyst which brought to fruition petitioner's desire to combine the selling and manufacturing aspects of the business so that the business could be sold as a package." If respondent's analysis presented a clear picture of the entire situation, we would be compelled to agree.

Ordinarily when a lump sum is paid to acquire the assets of a business, the amount paid in excess of the value of operating assets is attributable to intangible capital assets and thus is not currently deductible under section 162. *Florida Publishing Co. v. Commissioner,* 64 T.C. 269 (1975), affd. without

---

[4] Although the court's opinion places some reliance on Clark Oil's attempt to purchase the property prior to commencement of the tort litigation, we do not think the result reached would have been different had no such evidence been available. Other evidence established that the settlement amount related only to the price that Clark Oil had to pay to acquire the property, and that being the case, the claim actually settled had its origin in the acquisition process irrespective of whether prior attempts to purchase were made. We do not read the court's opinion to hold that in applying the origin test to a settlement payment, the tax character of a payment made to acquire a capital asset turns on the existence of a prior unsuccessful attempt to agree on a purchase price for that asset.

published opinion 552 F2d 367 (5th Cir. 1977). In this case, however, petitioner has a plausible claim that $300,000 of the amount it agreed to pay Cleanamation was not an acquisition cost but, rather, was incurred to dispose of two lawsuits pending against it. On its face the compromise settlement agreement supports petitioner's position,[5] as does the testimony of the attorneys for both petitioner and Cleanamation in the underlying litigation. In advancing his position that the settlement in this case was just a lump-sum purchase of a business, the unspecified amount of the liability exceeding the value of the operating assets being the amount paid to eliminate Cleanamation from competition, respondent has ignored the true relationship between petitioner and Cleanamation at the time the settlement was reached and has filled evidentiary gaps in his theory with suppositions not justified by the record.

The relationship between petitioner and Cleanamation differs from the common situation where one competitor acquires another. Petitioner manufactured the equipment sold by Cleanamation, and prior to mid-1969, Cleanamation was petitioner's only sales outlet in the United States. Once the exclusive sales contract between the two companies was breached, however, petitioner could eliminate Cleanamation from competition by simply refusing to sell its equipment to Cleanamation. That it chose not to do so while establishing its own sales organization represented sound business judgment.

Furthermore, contrary to respondent's assertion, petitioner did not acquire through the lawsuit settlement the same thing for which it had offered about $1 million the year before. Until petitioner established its own sales organization, Cleanamation was its marketing force. By purchasing Cleanamation in 1969, petitioner could acquire an established distribution system. Cleanamation's competitive position was quite naturally altered by the loss of its status as the

---

[5] Respondent's assertion that the compromise settlement agreement provides for no payment "in lieu of damages" is more technical than substantive. The document recites the pendency of the two lawsuits and contains a clause that the $300,000 obligation therein incurred by petitioner is "wholly in the nature of a compromise settlement." The plain meaning of the document is that the settlement liability is in lieu of the relief sought by Cleanamation in the lawsuits. The phrase "in lieu of damages" has no magical quality, and we would have no hesitancy in disregarding such an included phrase if the facts established that the liability was something else.

exclusive sales outlet for the equipment manufactured by petitioner, and once petitioner established its own sales force, Cleanamation's value to it dropped markedly.[6] Petitioner did not acquire Cleanamation's distribution system through the settlement. And it hired, at most, one of Cleanamation's ex-salesmen after the settlement.

What petitioner did acquire in the settlement was Cleanamation's inventory and the bundle of intangible capital assets necessary to market that inventory under the Cleanamation label. We are unable to find that the value of these operating assets exceeded the $150,000 allocated to their purchase in the Inventory Purchase Agreement. About 40 percent of the items classified as inventory were machines and parts collected over the years by Cleanamation and were not marketable by petitioner. Of the intangible operating assets, only one copyright was used by petitioner after the settlement. Moreover, these assets were acquired in a bulk sale in a declining market from a sales company which was getting out of the business. The inventory was sold as is, where located. Respondent's submission that petitioner acquired inventory with a value of $255,130.59 is totally unrealistic. *F. & D. Rentals, Inc. v. Commissioner*, 44 T.C. 335 (1965), affd. 365 F.2d 34 (7th Cir. 1966), cert. denied 385 U.S. 1004 (1967).

Our discussion of the value of Cleanamation's operating assets should not be taken to mean that the $300,000 liability is not a part of the purchase price of Cleanamation because the value of those assets did not approach $450,000. Quite the contrary, if we could find that the entire settlement obligation was merely the price that Cleanamation was able to command in order to get out of the business, the amount in excess of the value of the inventory would constitute a capital expenditure. *Clark Oil & Refining Corp. v. United States, supra.* See *Jordan v. Commissioner*, 60 T.C. 872 (1973), affd. per curiam 514 F.2d 1209 (8th Cir. 1975). We are interested in the value of the operating assets only insofar as they reflect on the credibility

[6] The record does not support respondent's assertion that petitioner was "apparently" unsuccessful in establishing its own sales force; Cleanamation's demise is persuasive evidence to the contrary. The fact that the laundry and drycleaning equipment market as a whole was declining, and petitioner's business along with it, does not indicate that petitioner was unsuccessful in setting up its own distribution system.

of the uncontradicted testimony that the negotiations for petitioner's purchase of Cleanamation were terminated in mid-1969 and that the $300,000 liability in issue was actually made to dispose of the claims in the two lawsuits. If their value greatly exceeded the value assigned to them by petitioner and Cleanamation, we would be inclined to disregard the testimony and find the "factual parallel" which respondent asserts exists between this case and *Clark Oil & Refining Corp. v. United States, supra.* Inasmuch as we find no reason to disturb the allocation made in the two settlement documents, we conclude that petitioner's $300,000 liability was actually made to settle the claims asserted against it in the two lawsuits. *Demkowitz v. Commissioner,* 551 F.2d 929 (3d Cir. 1977).[7]

We turn now to application of the origin test to those claims. Without regard to the particular legal theories advanced by Cleanamation, *Brown v. United States,* 526 F.2d 135, 139 (6th Cir. 1975), the origin of its principal claims against petitioner was in the competitive practices employed by petitioner. The dispute stemmed from termination of the exclusive sales arrangement between the two companies.[8] In

---

[7] Included in the inventory purchase agreement was a covenant not to compete running in favor of petitioner. Respondent does not contend that eliminating Cleanamation from competition by acquiring the covenant had any particular value to petitioner, but, rather, his argument is based on the excess purchase price theory. See *Florida Publishing Co. v. Commissioner,* 64 T.C. 269 (1975), affd. without published opinion 552 F.2d 367 (5th Cir. 1977). Implicit in that theory is a concession that Cleanamation's operating assets did not have a value approaching $450,000. Other than his reliance upon the book value of the inventory, however, respondent made no effort to assign values to specific assets. We recognize that insofar as petitioner's entitlement to a deduction for the $300,000 is concerned, if it were an acquisition cost, the particular values are unimportant. We have expressed above the reasons why we think they are significant. We mention it here for two reasons: (1) If we found that the two settlement documents were a sham and that petitioner actually paid $255,130.59 for inventory, the portion of the $300,000 liability attributable to acquisition of the inventory would not be characterized as a capital expenditure as the quote from respondent's brief near the beginning of this opinion suggests, see *Newark Morning Ledger Co. v. United States,* 416 F.Supp. at 698, but would be used in the computation of cost of goods sold, and (2) although the evidence indicates that the bundle of intangible capital assets petitioner acquired under the inventory purchase agreement had some value to it, see *Buddy Schoellkopf Products, Inc. v. Commissioner,* 65 T.C. 640, 645–648 (1975), the tax treatment of the $150,000 liability is not before us.

[8] Cf. *Lieb v. Commissioner,* T.C. Memo. 1974–272, affd. without published opinion 535 F.2d 1246 (3d Cir. 1976) (claim concerned termination of a business relationship).

attempting to develop its own sales potential, petitioner allegedly violated an oral agreement with Cleanamation not to solicit certain customers, made misrepresentations about Cleanamation, and used Cleanamation advertising materials. The claims had no nexus with capital assets that would place their roots in the acquisition process, see *Newark Morning Ledger Co. v. United States*, 539 F.2d at 934 n. 6, nor did they involve ownership rights of any capital assets. We find nothing capital about the kind of transaction out of which these claims arose.

The same cannot be said, however, about Cleanamation's claim that petitioner converted certain of Cleanamation's tools, dies, molds, and blueprints to its own use. *Anchor Coupling Co. v. United States, supra,* dictates that the portion of the settlement liability made to extinguish that claim be treated as a capital expenditure. The merits of the claim aside, petitioner protected its ownership of the capital assets in issue by removing that claim. *Anchor Coupling Co. v. United States, supra* at 433.[9]

The only question remaining is what portion of the $300,000 liability was attributable to settling the conversion claim. In its complaint Cleanamation asserted that the tools, dies, molds, and blueprints had a value of $125,000. Other than Cleanamation's assertions that prior to mid-1969 it had realized annual profits in excess of $100,000 and subsequent thereto it was operating at a loss, and the fact that petitioner's $300,000 obligation represented a compromise settlement of Cleanamation's claims against it, the record offers little evidence to help us determine the weight the parties in fact placed upon settling the conversion claim. Recognizing that under the circumstances "a rough approximation is all that can be expected," *DeMink v. United States, supra* at 870, and exercising our best judgment on the record as a whole, *Eisler v. Commissioner, supra* at 641, we hold that $100,000 of the total settlement liability in issue was a capital

---

[9] Petitioner erroneously assumes that the validity of the claims settled has some bearing on the deductibility of the settlement obligation. However, we are concerned only with the origin and character of those claims, not their merits. *Stoody v. Commissioner,* 66 T.C. 710, 715 n. 2 (1976); *Seay v. Commissioner,* 58 T.C. 32 (1972).

expenditure and the remaining $200,000 is deductible as an ordinary and necessary business expense.

*Decision will be entered under Rule 155.*