**Thomas W. DOWER, Plaintiff-Appellant,**

v.

**UNITED STATES of America,
Defendant-Appellee.**

**No. 80–2812.**

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 10, 1981.

Decided Dec. 23, 1981.

---

Thomas V. McCauley, Carrol, Hartigan & Hillery Ltd., Chicago, Ill., for plaintiff-appellant.

Farley P. Katz, Asst. Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before SWYGERT, Senior Circuit Judge, and CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

This is a suit for refund of federal income tax. The district court granted summary judgment against the taxpayer, Thomas Dower, and he appeals.

Dower, James Gleeson, and another man were the original stockholders of the Russell Packing Company, a meat-packing concern. In 1952 they entered into an agreement with certain employees of the company (the "Key Men"), including Gleeson, obligating the Key Men to purchase Dower's stock either upon his death or upon his giving notice of his desire to sell his stock. The agreement contained a formula that would set the purchase price of the stock somewhere between $1200 and $2000 per share depending on various contingencies. In 1965 Dower and the Key Men, without abrogating the 1952 agreement, further agreed that if the corporation was liquidated and its assets distributed, the Key Men would have the right to purchase Dower's stock at a price, again determined by a formula, that might exceed the $2000 maximum under the 1952 agreement.

In 1966 Russell Packing Company sold all of its operating assets, its corporate name, and its goodwill to another company for $1 million, leaving it with inventory and financial assets worth about $2.3 million. The next year the name of the company was changed to Peerless Investment Company. It was out of the meatpacking business; it was an investment company.

In 1968 Gleeson instituted a shareholder derivative action in state court against Dower and the corporation. In a separate state-court suit filed about the same time, Gleeson joined with three of the (other) four remaining Key Men to obtain specific performance of either the 1952 or 1965 agreements. Both suits were settled together in 1971. The settlement provided that Dower would pay the five Key Men (including the one who had not joined in bringing the second suit) an amount of money computed by multiplying the number of shares of Dower's stock to which they would have been entitled under the 1952 agreement by $1600; in exchange, the 1952 agreement was cancelled and all claims between the parties discharged.

Dower deducted the payments under the settlement agreement on his federal income tax returns for the years in which the payments were made, claiming that they were ordinary business and investment expenses which were necessary to preserve his position with Peerless (formerly Russell) and the value of his stock as an income-producing asset. The Internal Revenue Service

disallowed the deduction, amounting to several hundred thousand dollars, on the ground that the settlement payments were capital expenditures designed to preserve Dower's title to his stock, and this suit followed.

■ The expenses that a person incurs to acquire or dispose of an income-producing asset are capital expenditures. Internal Revenue Code of 1954, as amended, 26 U.S.C. § 263(a); Treasury Regulations on Income Tax (1954 Code), 26 C.F.R. § 1.212–1(k). They increase the basis of the asset and so reduce any capital-gains tax that might be due when the asset is sold, but they are not deductible from ordinary income. An example is the payment of a brokerage fee to acquire corporate securities. But the expenses one incurs to maintain the asset, for example by renting a safe-deposit box in which to keep one's stock certificates, are incurred to assure the receipt of income from the asset and are therefore deductible from ordinary income. 26 U.S.C. § 212. The payment of money in settlement of a lawsuit is, of course, a type of expense, and if the lawsuit is based on a claim of title to an income-producing asset it is a capital expense and is not deductible from ordinary income. But if the lawsuit relates instead to the production of income from an asset that is conceded to be owned by the taxpayer, it is an investment expense and is deductible from ordinary income. *See, e.g., Anchor Coupling Co. v. United States*, 427 F.2d 429, 433 (7th Cir. 1970); *Entwicklungs und Finanzierungs A.G. v. Commissioner*, 68 T.C. 749, 759–60 (1977).

If, therefore, the legal claims of Gleeson and the other Key Men related to their rights to acquire Dower's stock under the 1952 and 1965 agreements, so that the settlement payments were a means by which Dower in effect reacquired, at a price of $1600 per share, stock in Peerless Investment Company that the Key Men claimed was rightfully theirs, then the payments are nondeductible capital expenditures. The case would be indistinguishable from *Anchor Coupling Co. v. United States, su-*

*pra*, which held that litigation expenses incurred to defend a suit for specific performance of an agreement to sell the taxpayer's assets to another company were not deductible. If, on the other hand, the settlement was made to protect Dower's right as a director, officer, and stockholder of Peerless to continue to receive income from the corporation against claims of mismanagement or malfeasance, then the payments were deductible expenses.

■ Dower argues that the proper characterization of the settlement payments requires a trial to resolve such questions of motive or purpose as whether the Key Men in these lawsuits were really seeking money or stock and whether Dower thought he was fending off a challenge to his management of the corporation or defending his title to the stock. But this type of subjective approach, long used in cases of this kind under the name of the "primary purpose" test, was rejected in 1970 by both the Supreme Court and this circuit. *See Woodward v. Commissioner*, 397 U.S. 572, 577–78, 90 S.Ct. 1302, 1306, 25 L.Ed.2d 577 (1970); *Anchor Coupling Co., supra*. Courts now look not to the motives of the litigants but to the origin and character of the claim that was litigated, and in the present case it was possible to determine the origin and character of the claim (or claims) that Dower settled in 1971 from the state-court pleadings and the terms of the settlement. All of the relevant documents were before the district court on the cross-motions for summary judgment and they leave no doubt as to the proper characterization of the settlement payments.

The first of the two state-court actions, the one in which Gleeson was the only plaintiff, purported to be a shareholder derivative action; Gleeson was a shareholder; and shareholder derivative actions ordinarily involve claims of mismanagement rather than claims to ownership of stock. However, the principal wrongs alleged were the sale of the corporation's operating assets, its subsequent refusal to distribute the assets to the shareholders, and the refusal of the corporation to honor the 1952 agree-

ment, which was attached as an exhibit to the complaint. Moreover, when the suit was settled in 1971 along with the second suit, Dower was not required to make an accounting of the affairs of the corporation which he had allegedly wronged or to pay anything to the corporation. The settlement awarded no relief at all to the corporation even though the suit had purported to be on its behalf.

The second suit had three counts. The first, in which Gleeson alone joined, essentially duplicated the first suit. In the second and third counts, Gleeson was joined by three of the four other Key Men. These counts sought specific performance of the 1952 and 1965 agreements, respectively. More particularly, Count II alleged that the plaintiffs were entitled to obtain the stock provided for in the 1952 agreement at $2000 a share, and asked that the 1965 agreement be declared null and void. Count III asked, alternatively, that the 1965 agreement (which fixed a higher maximum price for the stock) be specifically performed.

■ The shareholder derivative claims in the second suit, like those in the first, played no part in the settlement, since no payment or other relief was awarded the corporation. The settlement was a buy-out of the Key Men's claims to Dower's stock at a price of $1600 per share—the exact midpoint of the range of prices at which the 1952 agreement had valued the corporation's stock. The payments were allocated among the Key Men in proportion to their relative entitlements under the 1952 agreement, the fifth Key Man being included in the settlement even though he had not been a plaintiff in either suit.

■ Dower claims, however, that the settlement could not have been in compromise of the specific-performance claims rather than the shareholder-derivative claims (or at least that sufficient doubt was raised to make summary judgment inappropriate), because the specific-performance claims were groundless. Dower had not died—the triggering condition under the 1952 agreement. Russell Packing Company had not been liquidated—the triggering condition

under the 1965 agreement. But death was not the only event that would trigger the 1952 agreement. Another was notice that Dower intended to sell his stock. The partial liquidation and complete change of activity of the company could conceivably have been deemed a notice that Dower was leaving the meat-packing business and hence "intended" to sell his stock within the meaning of the 1952 agreement. As for the 1965 agreement, while it made no express reference to a partial liquidation, the parties may have intended the agreement to cover a complete liquidation of the company's meat-packing business, which occurred. However inartfully drafted, the 1952 and 1965 agreements evidently were designed to make provision for the Key Men in the event that the business was wound up or Dower, the dominant figure in it, departed. The fact that the parties did not foresee the precise way in which this would occur—by a liquidation of the operating part of the business and a conversion of what remained into an investment company—does not prove that they were without any rights under the agreements.

Even if the Key Men's claims to the stock were thinner than we have supposed, since the settlement gave nothing to the corporation we cannot see how the settlement payments can be viewed as a compromise of the derivative actions rather than of the specific-performance claims. Nor can we see how a settlement figure that was arrived at by multiplying the number of shares to which the Key Men were entitled under the 1952 agreement by a per-share dollar value within the range specified in that agreement, and that was actually paid to the Key Men rather than to the named plaintiffs as such (and in the proportions to which the Key Men were entitled under the 1952 agreement), could be viewed as anything but a settlement of the dispute over who had title to the stock.

■ We have thus far treated the issue of characterization as one of either-or. Litigation expenses might be incurred both to defend title and to protect income production, and there is authority for allocating

the expenses in such cases between the two objectives. *See, e.g., Larchfield Corp. v. United States,* 373 F.2d 159, 166–67 (2d Cir. 1966); *Entwicklungs und Finanzierungs A.G., supra,* 68 T.C. at 766. Here, since the settlement gave nothing to the corporation, on whose behalf the claims of mismanagement by Dower were made, but instead tracked the terms of the 1952 agreement which gave the Key Men at least a colorable claim to Dower's stock, allocation would not have been appropriate.

Though it hardly matters, we note in closing that Dower's claim would fail even under the rejected "primary purpose" test. Dower emphasizes that the Key Men acknowledged at their depositions that they had wanted cash rather than stock. But it is natural in a settlement negotiation to prefer receiving cash to stock in a closely held corporation dominated by an individual with whom you have had a falling out; this preference has nothing to do with the nature of the claim that was settled. Dower also points to certain recitals in the settlement agreement to the effect that his intention in settling was to preserve his position in Peerless and avoid the derivative suit. These recitals could have had no purpose other than to throw the Internal Revenue Service off the scent; they have no probative value in this litigation.

The judgment is

Affirmed.