**NEWARK MORNING LEDGER COMPANY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 590–72.**

United States District Court, D. New Jersey.

July 16, 1975.

Donald A. Robinson, Robinson, Wayne & Greenberg, Newark, N. J., for plaintiff; Charles Sabin and John R. Coughlin, Sabin, Bermant & Blau, New York City, of counsel.

Scott P. Crampton, Asst. Atty. Gen., Jerome Fink and Stephen T. Lyons, Attys., Dept. of Justice, Washington, D. C., Jonathan L. Goldstein, U. S. Atty., Newark, N. J., for defendant.

## OPINION and ORDER

BIUNNO, District Judge.

*Nature of Action*

This is a suit to recover federal income taxes assessed by deficiency and paid, with interest, under protest. A single question is involved, namely, whether litigation and other legal expenses incurred for the years involved were properly deductible against income as ordinary expenses in the operation of a business or whether these costs represent a capital expenditure which form part of the cost basis of acquiring a newspaper business in Springfield, Mass.

There is no dispute that the costs were incurred, and no dispute about their amount. The dispute involves only the correct treatment of the costs for income tax purposes.

A stipulation of facts has been prepared and agreed to, accompanied by authenticated exhibits. Both parties have moved for summary judgment. On each motion the sole question is whether, on the basis of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." F.R. Civ.P. 56(c).

*Facts as Stipulated*

Samuel I. Newhouse owns all of the voting stock of Advance Publications, Inc., which owns various newspapers throughout the United States, one of them being the Newark Morning Ledger Co. (Ledger), a wholly owned subsidiary, and the plaintiff here. (Stip., par. 7).

[The court will take judicial notice that the Ledger is New Jersey's only statewide newspaper, both on weekdays and Sunday, as well as its largest, having surpassed its major competitor, The (Newark) Evening News and Sunday News (the latter being a successor of the Newark Sunday Call) in circulation and advertising before the latter's demise after a protracted strike during the last decade. Fed.Rules of Ev., Rule 201(b), (c).]

In 1960, the Republican Company [Republican], a Massachusetts corporation, owned two operating newspaper subsidiaries (Republican Publishing Company and Springfield Union Publishing Company) which published three newspapers in Springfield,

Mass: two daily papers and a Sunday paper. (Stip., par. 5).

At that time, there were 177 shares of common stock of Republican outstanding. Of these, 23 shares (13%) were owned by pension funds for the employees of the newspapers (Funds). Another 74 shares (42%) were owned by collateral relatives of the Bowles family (Cousins), and the remaining 80 shares (45%) were owned by the family of the deceased publisher, Bowles (Family). (Stip., par. 6).

The 80 shares of Family stock were held in 1960 in a voting trust set up by a 1952 agreement between Family and Funds, to pool their combined 103 shares for 15 years. Control was in the trustees of Funds, who were also directors, officers and employees of Republican and the operating companies. (Stip. par. 6).

Following a proposal from a representative of the Cousins, Newhouse became interested in an acquisition, and following negotiations, two transactions ensued:

(a) purchase by Ledger of the Cousins' 74 shares at $25,000 a share ($1,850,000) on June 6, 1960;

(b) an agreement by Ledger to purchase the Family's 80 shares, the shares to be received at termination of the voting trust in 1967, at $21,000 a share ($1,680,000), which was deposited in a Boston bank on June 17, 1960 against delivery of the stock. (Stip. par. 8, 9, 10).

Subject to the voting trust, Ledger thus came to own the beneficial interest in 154 shares (87%) of all of the outstanding stock of Republican. The remaining 23 shares (13%) remained in the ownership of the Funds. (Stip., par. 11).

On June 17, 1960, Newhouse met Cook (an officer of Republican) in New Haven, told him of the purchase and arranged for an announcement in the evening Springfield paper that day, which was done. (Stip., par. 13).

On the following Sunday, an editorial appeared in the Sunday Springfield paper, which was critical of the paper's acquisition by "outside interests". (Stip., par. 13).

As a result, Newhouse asked for a meeting which was held in New York. Newhouse was told he should sell the stock, and he refused. A request to tour the newspaper plants at an early date was put off. Requests were made to examine books and records and to be given financial information, but these were denied. (Stip., par. 12, 13, 14, 15).

Ledger thereafter filed, or caused to be filed, a flurry of lawsuits in Massachusetts. Two were in federal court and four in the state courts. The complaints are part of the stipulation as Exhibits A through F. (Stip., par. 16).

Extended hearings by masters were conducted in both courts, and after review of the State court's proposed disposition, a settlement was achieved that resolved all the litigation. (Stip., par. 17, 18).

The aggregate legal fees and expenses incurred by Ledger from fiscal 1962 through 1967 are stipulated, as are the amounts assessed and paid as deficiencies plus interest, for which refund is claimed. (Stip., par. 19 through 42).

In the Stipulation, the United States explicitly refused to stipulate the "purpose" for which the litigation was initiated and proceeded, or the "gravamen" of each lawsuit. (Stip., part II, par. 1 and 2).

Similarly, Ledger explicitly refused to stipulate that Newhouse was told, before buying the Family stock, that there had been trouble with management about dividends and about access to books and records, and that Newhouse would be "buying a lawsuit" in these respects. Also, Ledger would not stipulate that Newhouse was told that the reason why Family and Cousins wanted to sell was their feeling of denial of a management voice and unfair treatment by management.

*Treatment of Facts Not Stipulated*

The court has examined the pleadings, as well as the discovery depositions of Samuel I. Newhouse, Sidney R. Cook, and Donald E. Newhouse, and the depositions de bene

esse of Francis T. Bowles (Family interests) and William H. Baldwin (Cousins interests).

■ From these materials, as well as from Exhibits A through F of the Stipulation it is plain that Ledger's "purpose" in the litigation, as well as the "gravamen" of each lawsuit, are matters of law for the court to determine from inspection of the complaints filed.

If "purpose" is a pertinent element, it can only be considered in the ostensible or objective sense. Subjective purpose, as a state of mind, cannot have any bearing on the key issue here. Even if it were, the materials indicate that it would be impossible to compose a collective state of mind for the individuals who participated: Samuel I. Newhouse, the primary figure, his son, Donald, who was involved on a day-to-day basis, house counsel and Massachusetts counsel.

The same observation is true of the "gravamen" of the suits. This is a matter of legal evaluation and interpretation from the authenticated documents, and a study of them discloses that there is no genuine issue of fact in regard to their "gravamen".

The facts which the United States sought to have stipulated, and which the Ledger declined, are not undisputed facts largely because they are only part of the facts developed on discovery and de bene esse. Taken alone, to the extent there is some testimony to support them, they would not provide a fair basis for ruling on the motions.

Taken together with other contextual testimony, a somewhat different pattern emerges.

■ Accordingly, the court has approached the motions by considering whether these fact items not stipulated are facts having a legal consequence in arriving at a decision. If they do, then being disputed both motions would need to be denied. If they do not, a resolution on the motions can be made.

*Nature of the legal questions*

Two major legal questions appear in this case:

1. Were the legal and litigation expenses allowable as deductions under § 162(a) of the 1954 Internal Revenue Code, 26 U.S.C. § 162(a)? To qualify under this head, it must appear that the item was

. . . "paid or incurred during the taxable year",
. . . for "carrying on a trade or business",
. . . an "expense"
. . . a "necessary" expense, and
. . . an "ordinary" expense.

See *Commissioner, etc. v. Lincoln, etc.*, 403 U.S. 345, at 352–353, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971) and cases cited.

From the submissions made, the dispute centers only on the element whether the expense was for "carrying on a trade or business." No dispute appears for the other elements.

2. Were the legal and litigation expenses "capital expenditures", Treas.Reg. § 1.263(a)–(2)(a), and consequently not allowable as deductions under § 162(a)?

It is clear that capital expenditures have never been deductible as current expenses (except through depreciation) or otherwise taken into account for income tax purposes (except as they affect the basis for capital gain or loss). *Woodward v. Comm'r*, 397 U.S. 572, at 574–576, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970).

From the submissions made, this appears to be the controlling question.

*Carrying on a trade or business*

■ The United States presses most emphatically the question whether Ledger "was in the business of owning stock in newspaper publishing companies." The definition so attempted creates a false premise and hence leads to a false conclusion.

This case does not involve the question that frequently arises in the case of individual taxpayers, namely whether a given activity is a business activity or a personal activity. Private business corporations organized for profit are necessarily engaged in business. Thus, the real question here

has different boundaries than it might have with an individual taxpayer.

No doubt an individual taxpayer can engage in one or more kinds of business to the same extent that a partnership or a corporation can. It is only because the activities of an individual are amorphous—he can usually engage in any business that a corporate entity can, and some that are prohibited to a corporation, as well as in personal, nonbusiness activities—that issues of identification of the business tend to arise.

Corporate businesses, as is well-known, are carried on in countless ways, but the variety has no bearing on the business/personal distinction.

A department store or highway shopping center may arrange for one or more lines of goods or services to be actually sold by others under its business banner. Concession arrangements in this field are very common, as are lease arrangements. Yet it would be fictional to argue that a department store must show that it is in the concession business in order to have a business expense deduction for legal costs or accounting costs incurred in resolving a dispute with a concessionaire over the amount payable to the store from the operation of the concession. Similarly, it would be unreal to require a shopping center to establish that it was in the business of renting real estate in order to be allowed a business deduction for legal or accounting expense in resolving a dispute about the proper calculation of percentage of sales to be paid.

In these well-known examples, the prime business is merchandising goods and services at retail. Some of it is done directly, and some is done indirectly through concessions or leases. But there is inevitably a synergistic effect on the prime business. The availability of a wide variety of goods and services brings in more customers in all, and stimulates impulse buying. Customers will stay longer in the area and buy more there than they might otherwise. And the prime business engages in this *form* of arrangement because it stands to gain whether the customer buys from it or from a concession or tenant.

Not uncommonly, the peripheral activity may be one that is widely engaged in by itself. The operation of a restaurant in a department store does not require a determination that the store is in the restaurant business. It may lose money on the restaurant, considered separately, but the restaurant is an integral part of the merchandising business because it encourages customers to spend more hours in the store, which increases the probability that they will buy more goods or services in the retail operation.

A textile mill may decide to acquire a fiber plant in order to reduce its raw material costs, assure itself of a source of supply, and control the quality of the fiber to meet its needs. A furniture factory may acquire standing timber or a sawmill for similar business considerations, without itself being in the timber business or the sawmill business. A metals supplier may buy futures in steel or copper to protect its position on its contracts for future delivery without becoming an investor in futures as such.

All these activities, and countless others, are examples of activities undertaken and engaged in to support the primary business, whatever it may be, and they are part and parcel of it.

It is also well-known that depending on many complex factors, such related and supporting activities may be engaged in through various forms. There may be outright acquisition and ownership of plant and equipment. There may be joint venture arrangements. There may be acquisition through stock ownership of a separate corporate entity. The form that the activity takes is not significant. What is significant is the relationship to the business and its fundamental nature.

Securities—stocks and bonds—acquired to establish a reserve to retire a bond issue at maturity, may in a particular case be similar to ordinary investments by an individual. But this would not be so for a casualty insurance company making investments in unrelated businesses in order to have premium revenue realize earnings

pending the resolution of claims for losses. Such a company is not "in the investment business" but the making of the investments is inextricably bound up with the operation of the casualty insurance business. Proper additions to reserves are accordingly recognized as current expenses even though the amount may be invested pending resolution of the claims.

Turning to newspapers, there can be no serious claim that acquisition of a newsprint paper mill, or of a printing ink plant, through the purchase of stock, requires a showing that the taxpayer is in the paper business or the ink business, for the purposes of this case. The business nature of the acquisition, although itself a capital item, is part and parcel of the newspaper business. This is obvious.

The acquisition of another newspaper—the very same business—is even more obvious, whether it be accomplished by the purchase of assets or the purchase of stock.

In the context of this case, the claim that the expense would be allowable only by reason of a showing that the taxpayer was in the business of "owning stock in newspaper publishing companies" is without substance.

*The nature of the expense as capital or not*

■ The primary inquiry is whether or not the expenditures for legal fees in processing the litigation were capital expenditures. As observed in *Woodward*, 397 U.S. 572, 575, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), if an expenditure is capital it cannot be deducted as "ordinary and necessary", either as a business expense under § 162 of the Code, or as an expense of management, conservation or maintenance under § 212.

In *Woodward*, the court ruled that in deciding whether an expenditure was capital or not, the index to be applied is the origin and nature of the expenditure. In so doing, it declined to apply to this question the "primary purpose" test developed by the cases in measuring the application of Treas.Reg. § 1.263(a)–2(c).

It seems clear, on a reading of *Woodward* and *Hilton Hotels*, (*U. S. v. Hilton*, 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585) as well as other Supreme Court rulings, that the court did not replace the primary purpose test with the origin and nature test for cases where the applicability of that regulation is in issue. What it did do was to refuse to apply that test to *another* regulation, § 1.263(a)–2(a), dealing with capital expenditures generally; and it commented that for the application of the regulation to expenditures for defending or perfecting "title", the primary purpose test may be the best that can be devised. 397 U.S. 572, 577, 90 S.Ct. 1302, 25 L.Ed.2d 577.

But that distinction is not a question here because this is not a "defending or perfecting title" case. The stock interests were purchased from the sellers at an agreed price, which was paid, and no challenge to its ownership was made, nor does any imperfection in the title appear.

The "origin and nature" test, as expressed in *Woodward*, is obviously intended to reduce to a minimum the fact elements to be taken into account, and to try to limit the category of controlling facts as much as feasible to "objective" rather than "subjective" facts. Time alone will tell whether this effort to confine the issues and minimize disputes will be successful. One thing is clear: to the extent that the facts going to origin or nature are bound to vary in one case or another, the outcome will inevitably vary. But the aggregate number of disputes may be diminished.

■ The later ruling in *Lincoln Savings*, 403 U.S. 345, 91 S.Ct. 1893, 29 L.Ed.2d 519 (1971) refers neither to the "primary purpose" test nor to the "origin and nature" test; but in concluding that the additional premiums paid under § 404(d) of the National Housing Act were capital expenditure, the majority opinion obviously placed great weight on the nature of the expenditures. The dissent does the same thing, and arrives at the opposite conclusion. The teaching here is that labels do not control; the facts do. Calling a tail a leg will not give a cat 5 legs.

Taken together, *Woodward* and *Hilton Hotels*, also make clear that an origin and nature determination is independent of the timing or sequence of events. If an expenditure is capital, it retains its character whether it precedes, coincides with or follows the acquisition of property, in cases where such acquisition is pertinent. Conversely, where the expenditure is not capital.

Some simple, noncontroversial examples will illustrate the teachings of those cases. Suppose A owns, for business purposes, a commercial building and sells it to B. If the building is old, and lacks air conditioning, the sale price will be affected adversely. If A decides to install air conditioning before putting the building on the market, the expenditures will obviously be capital expenditures. The sale price can be expected to be favorably affected from A's standpoint. But if A does not do so, and B does, after buying the building, B's expenditures will also be capital, and this is so even though the purchase price of the buildings were lower on that account. Thus, the result will be the same in both situations, and this is because the addition of air conditioning is, in its origin and nature, a capital expenditure. It makes no difference whether it is added before marketing, or as a condition of the sales agreement, or long after title closes.

Take another case, on the same building, except suppose here that the paint is peeling, plaster is cracked, and faucets are leaking. The expense of painting, repairing the cracks and putting new washers in the faucets would be repairs and as such would be ordinary and necessary expenses rather than capital expenditures. If A offers the building "as is", he will get less for it than he would if he makes the repairs first. If B buys "as is", he will pay less for the building and will himself incur the expense. But whether A or B makes the repairs, before or after the sale, their cost will not be a capital expenditure, because that is not their origin and nature.

Now, whatever set of circumstances one may choose among these examples, it is obvious that B will know in advance whether or not the building has air conditioning, and whether or not it needs repairs. While this advance knowledge or awareness will inevitably affect his judgment in deciding what price to pay, it will not have any effect on the character of the expenditure for the work, as being capital or not.

It may seem inconsistent, in the case where A does the repair work first, before marketing, that he can expense the costs and yet increase the sale price of the building, which becomes B's capital or cost basis, including the effect of the repairs. But there is no inconsistency because the making of repairs does no more than restore the value of the building to the level of one that is kept in good condition. Repair costs are not improvement costs. And it is not uncommon, even where A does the painting before selling, for B to incur further painting expense to suit his purposes, as by changing colors.

For these reasons, the discussion in the briefs submitted on the question whether Newhouse realized or had reason to expect, before he bought the stock, that litigation might follow and the like, has nothing to do with the dispute to be resolved here. Whether the litigation expense was capital or not is to be decided from the origin and nature of the expense and not by whether the litigation was anticipated. To inject this factor would be to inject considerations of motivation and purpose, and these are elements which the Supreme Court has excluded.

Take another case. Suppose that A owns a department store in which some of the departments are concessions, and sells the business to B. A may be an incompetent or indifferent businessman, and B may be alert and aggressive. If B has reason to believe that the concessionaires are not properly recording their sales volume and therefore reducing their payments under the concession licenses, he will likely bring in auditors and put the ship in shape. Doing so may involve litigation expense. But the expense will not be a capital expenditure because its origin and nature is to

achieve the revenues the business is entitled to have, and if successful its earnings will be improved. This result will enhance the value of the business as a going concern, but that fact does not make the litigation expense a capital one. The principle is no different than that a good maintenance and repair program will increase rentals, and increased rentals can enhance the market value; but maintenance and repair costs are obviously not capital ones.

■ Also, whether the litigation succeeds or fails is not a factor, and whether its result indirectly enhances capital values is not a factor. The only considerations that control the question are the nature and origin of the expense incurred.

■ In this case, the complaints and amended complaints filed in the course of litigation are stipulated exhibits. They speak for themselves. A detailed and careful examination of them discloses that while the earliest versions indicate that the draftsman lacked the detailed information to particularize the allegations, the later ones certainly, and all of them taken together in any event, advance a claim that the fund trustees had been and were siphoning off *earnings* of the newspapers to the funds and to themselves. The devices charged were those of making excessive contributions to the two pension funds, as well as making generous, long-term employment contracts and paying unwarranted bonuses.

While the structure to be dealt with involved trust and fiduciary concepts which led highly competent counsel to couch their allegations in legal terms suitable to the circumstances, the origin and nature of the claim is no different than a claim to recover sales revenues pocketed by a clerk from the cash register, or by falsifying expense accounts.

This being the origin and nature of the claim, it is also the origin and nature of the expense incurred to advance the claim. No rational basis appears from the record to support the contention that the litigation expense was capital in nature. Even if the litigation failed to recover one penny of past drains of current revenue, its success in cutting off further flows, like putting a washer in a leaky faucet, would reduce current expenditures and improve net earnings. A claim having that origin and nature is no different than an expense for repairs that will cut down the water bill.

Of course, Newhouse paid less for the stock than he would have if the Family and Cousins had been equally aggressive businessmen. They were either too indolent, or else were unwilling to take the risk of failure, to do themselves what Newhouse did. If they had, the stock would have been worth more, just as a well-kept building would, but the expense of protecting the enjoyment of the real earnings against diversion would not have been a capital expenditure for them, any more than they were for Newhouse.

An argument is advanced that in any event the one lawsuit aimed at the 50% interest in the TV station incurred capital expenditures to recover a capital asset. This issue is not in the pleadings or pretrial order, and defendant has no basis for advancing it for the first time in its brief. The argument could be rejected on that ground alone, but it does not withstand scrutiny on the merits.

■ In the case of the TV station claim, the assertion made was that the fund trustees diverted to the fund a corporate opportunity offered to the newspaper and that it was a natural and desirable opportunity in conjunction with the newspaper business. The claim was one to compel the disgorging of the diverted advantage, but this related to the earnings and profits which the defendants enjoyed and which they had diverted to themselves. As a suitor seeking equity, the claimant could not seek the free turnover of the capital asset acquired by the diversion of the opportunity. The trustees, under well-established equitable principles, would be entitled to be reimbursed what they had paid for the TV station interest, and to turn it over at cost along with their earnings and profits. Reimbursement of the cost would merely involve

a conversion of money into other property without affecting the amount of the capital assets of the newspapers. The capital assets would remain exactly the same, but the earnings would be enhanced or deteriorated, depending on the financial success of the business activity. Thus, it is plain that, taken alone, the TV station claim is no different in origin and nature than the other claims for diversion of earnings. Taken together with them, there can be no question that all the claims had their origin and were in the nature of claims for recovery of diverted or siphoned earnings.

Some confusion has crept into the argument by the use of the term "assets". Every kind of property owned is an asset, but the fact that something is an asset is not enough to say that it is a capital asset. A clerk's theft of a $10. bill from the cash register is a theft of current revenue from operations, even though the $10. is an asset. The same is true of the embezzlement of $10. by a false expense voucher.

■ Expenses incurred to recover diverted operating revenue or false charges to operating revenues are not capital expenditures even though their aim is to recover an "asset".

■ But were the argument valid, it could not be advanced for the first time in the final briefs and after the facts pertinent to the issues theretofore existing had been gathered and stipulated. To do so would deprive taxpayer of the opportunity of obtaining from its counsel, who prepared the bill of complaint in equity (Exhibit C), data to allocate to the TV station issue those items of cost, out of the aggregate legal expenses for all the litigation, that related to it. There were eminent Massachusetts counsel on both sides, and the likelihood is high that both of them kept the usual records to enable the allocation to be made from what appears in both records. Had this issue been raised even as late as the pretrial conference, there would have been ample time to compile the data.

However, as noted above, and for the reasons stated, no allocation is called for.

In reviewing the materials, there is one question that has occurred to the court which has not been addressed by either side.

■ That question arises from the fact that on the settlement of the litigation, Funds agreed that in satisfaction of the diverted earnings they were to repay to the two operating companies, they would transfer the 23 shares (11.5 shares to each operating company) of Republican which the Funds owned. (Stip., Exhibit G, par. 3).

Although the legal title to this stock was in the two publishing companies, the net economic effect was to eliminate the 13% minority interest in Republican, because one publishing company was wholly owned by Republican and the other was 97% owned by it. (Stip., par. 5).

The court accordingly considered the question whether the recovery of the refund claimed should be limited to 87% of the total, the other 13% being allocable on a rational basis to the elimination of the 13% minority interest.

After thorough consideration and further review of the cases, it was concluded that this modification of the refund could not be supported under the controlling precedents.

It was decided in *United States v. Gilmore*, 372 U.S. 39, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963), and the decision on the point was approved in *Woodward, supra*, that the consequences of the litigation are to be rejected.

If origin and nature are to control, as the Supreme Court has ruled, on the question whether an expenditure is capital or not, then just as motive and purpose must be excluded, so must consequences or results. The salary of a sales manager is a deductible expense even though he proves to be unable to sell. It is also a deductible expense if he is so successful as to double the value of the business.

The transfer of the 13% stock interest was no more, in any event, than the means for satisfying the obligation to restore diverted earnings. Had there been a judgment for the diverted earnings, and no

more, it could have been satisfied by execution on the stock and bidding in on the sale.

 Finally, it appears from some of the depositions that the United States explored the question whether, as a result of the litigation, the voting trust agreement was terminated about 1 year before the scheduled 1967 date. No argument based on this testimony has been advanced, but the question was evidently explored in the hope of finding a fact basis for claiming that the litigation was part and parcel of the acquisition, since actual control could not be achieved until the Family stock was freed from the voting trust.

The settlement judgment and accompanying documents (Stip., Exhibit G) make no mention of an early termination of the trust agreement. Nothing else in the record establishes that there was in fact an early termination. But, even if there were some such effect or result, it would not alter the disposition here.

Take another case. Suppose A owns a commercial building, rented to a single tenant on a long-term lease for a net percentage rental, with the tenant making all repairs and paying all expenses for taxes, utilities and the like. Suppose the tenant is a "trouble" tenant, who has allowed the building to fall into a state of disrepair, has allowed taxes and water bills to accumulate, and who has diverted business to a new location of his own across the street despite a "best efforts" clause and a restrictive covenant reasonable as to time and place.

If A is an indifferent or timid businessman, he may be unwilling to take the steps necessary to hold the tenant to his lease, and may be realizing improperly diminished rents and may be exposed to liens for current taxes and water charges, as well as to accumulating expenses for maintenance and repair.

Suppose the term has 7 years to go, and A offers to sell the building to B, who buys it.

Suppose B presses the tenant, with litigation if need be, to compel him to pay the delinquent taxes and water charges, to make the needed repairs, and to account for percentage rents on diverted sales.

Suppose the tenant realizes the risk of the litigation, and negotiates a settlement which includes early surrender of the lease so that B can relet to a responsible tenant.

B will realize early possession, in this example, but the expense will be ordinary and necessary and deductible, rather than a capital expense. The tenant's remaining term is "property", and the leasehold is an "asset", but possession is related to the right to current use, and the price for current use is not capital but a return for the use of capital.

Thus, even though the efforts of B result in early termination, the origin and nature of B's claim are related to realization of the enjoyment of the tenant's obligations and not to the acquisition of a capital asset. The same would be true if A incurred the expenses and secured tenant compliance before offering the property for sale.

As with the earlier examples involving repairs and maintenance, the sale price is likely to be higher if A straightens out the tenant first, and lower if he does not, but this consequence or result is not a factor that can be recognized in determining the origin and nature of the claim to advance which the costs are incurred.

*Conclusion*

For the reasons stated in the foregoing order, the court concludes that there is no genuine issue as to any material fact, and that plaintiff is entitled to judgment as a matter of law.

Defendant's motion for summary judgment is denied. Plaintiff's motion for summary judgment is granted.

SO ORDERED.