ELLIS BANKING CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ellis Banking Corp. v. Commissioner
Docket No. 13848-78.
United States Tax Court
T.C. Memo 1981-123; 1981 Tax Ct. Memo LEXIS 622; 41 T.C.M. (CCH) 1107; T.C.M. (RIA) 81123; March 17, 1981. *622 Held, certain accounting and other expenses incurred by petitioner, a bank holding corporation, were incurred in connection with the acquisition of the stock of another bank, a capital asset, and must be capitalized and are not deductible as ordinary and necessary business expenses. Michel G. Emmanuel and Nathaniel L. Doliner, for the petitioner. Victor Becker, for the respondent. DRENNEN
*623 MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: In the statutory notice of deficiency respondent determined a deficiency of $ 24,171 in petitioner Ellis Banking Corporation's income tax for 1974. Due to concessions by both parties, [1] the sole issue for decision is whether certain expenditures incurred by petitioner Ellis Banking Corporation were ordinary and necessary business expenses properly deductible under section 162, I.R.C. 1954, [2] or whether they were costs incurred in connection *624 with the acquisition of a capital asset and thus required to be capitalized under section 263. *625 FINDINGS OF FACT Some of the facts were stipulated and they are so found. The stipulations of fact, together with the exhibits attached, are incorporated herein by this reference. Petitioner Ellis Bank Corp. (hereinafter petitioner) is a Florida corporation which had its principal place of business in West Bradenton, Fla, when its petition was filed in this case. Petitioner, an accrual-method taxpayer, filed a consolidated Federal income tax return, form 1120, for the calendar year 1974 with the Internal Revenue Service Center, Chamblee, Ga. Petitioner has filed consolidated income tax returns since 1972. I. Background Information
Petitioner is a registered bank holding company established under the Bank Holding Company Act of 1956, ch. 240, 70 Stat. 133, 12 U.S.C. sec. 1841 et seq., as amended. It was organized as a bank holding company in March 1972 with 15 banks as subsidiary corporations. Originally, a controlling stock interest in these 15 banks had been acquired individually, beginning in 1946, by A. L. Ellis, petitioner's chairman of the board, and/or his wife. The stock of these banks was exchanged for stock in petitioner. Between *626 March 1972 and December 1974 petitioner organized or acquired six additional subsidiary banks. The bank-holding-company concept was popular in Florida during the time petitioner was organized because it provided a vehicle by which a bank could expand its business into new market areas. At that time Florida State law did not permit a bank to establish branches, thereby limiting a bank's growth potentional. By organizing a bank holding company which could own the stock of various individual banks, the business of a single "bank" organization could be expanded either by acquiring the stock of existing banks or by organizing new bank corporations. Subsequent to the years here involved, Florida law was changed to permit a bank to establish a branch in the particular county in which the bank was located. This change reduced the utility of the bank-holding-company concept as a vehicle to expand a bank's business. Petitioner acquired the stock of various banks, both for cash and by way of exchanges of stock, as a means of expanding its business. It has never sold a bank and it does not organize and acquire banks with the intention of selling them. Since county-wide branch banking *627 has been permitted, petitioner has acquired the stock of only four banks while establishing fourteen branches of existing subsidiary banks. Although petitioner supervises its subsidiary banks, it does not manage their day-to-day operations. Those duties are performed by the management employees of the individual banks. However, certain large loans to be made by a subsidiary must be approved by petitioner. In addition, petitioner does perform services for the subsidiary banks through its following divisions: (a) Accrual--Performs the income and expense auditing for petitioner and its subsidiary banks; (b) Accounting--Performs petitioner's accounting and assists its subsidiary banks in accounting matters, and prepares tax returns and consolidated statements; (c) Credit--Obtains large national lines of credit for its subsidiary banks, assists them in analyzing credit, audits large loans, and assists its subsidiary banks in managing large loans. (d) Executive--Establishes management policy for petitioner and its subsidiaries; and (e) Audit--Performs statutorily required auditing and audits its subsidiary banks for management purposes. The sources of petitioner's income *628 are dividends from subsidiary banks and management fees paid by its subsidiary banks for services. Petitioner uses its income to operate, pay dividends, and organize and manage banks. II. Bank Acquisition in Issue. By letter dated June 11, 1973, petitioner offered, subject to certain terms and conditions, to exchange shares of its $ 1-par-value common stock for all the 35,000 issued and outstanding shares of $ 10-par-value common stock of Parkway National Bank of Tallahassee (hereinafter Parkway). The offer contained in the letter was the result of prior discussions between petitioner and Parkway and it reflected a preliminary agreement between them as to the purchase offer and the principal conditions thereof. Included among the conditions of the purchase offer was the following: For the purpose of preparing the application for approval by the Board of Governors of the Federal Reserve System of the proposed acquisition, authorized representatives of Ellis, including its audit staff, and members of the firm of Peat, Marwick, Mitchell & Company, Certified Public Accountants, shall have the right to examine the books and records of the Bank [Parkway] as they may deem *629 necessary. Such examination shall be completed within sixty (60) days from the date of the acceptance of this offer by the Board of Directors of the Bank (unless the completion date is extended by mutual agreement), and you will then be notified whether Ellis will proceed with the Plan of Acquisition. If the examination discloses any fact or condition not previously disclosed to Ellis which, in Ellis's opinion, may be detrimental to the financial condition of the Bank of [sic] Ellis, or which may cast doubt on the accuracy and fairness of the exchange ratio provided herein, this Letter Agreement and the related Plan of Acquisition may be terminated and withdrawn. This proposal shall be conditioned upon there being no substantial adverse change in the financial condition of the Bank, or its results of operation from that shown on its most recent Statement of Condition and the Income Statement, for the period ending on the same date as the Bank's most recent Statement of Condition. Parkway's board of directors approved petitioner's offer on June 14, 1973. On August 21, 1973, petitioner, Parkway and certain of Parkway's shareholders executed an agreement for the acquisition *630 of Parkway common stock. This agreement superseded the offer contained in petitioner's letter of June 11, 1973. The introductory paragraphs of this agreement provided that it was the intent of the parties thereto that petitioner acquire all (but not less than 90 percent) of the Parkway shares outstanding and that the exchange of stock in petitioner for stock in Parkway qualify as a reorganization under section 368(a)(1)(B). The agreement also contained certain terms and conditions which qualifed petitioner's offer to acquire Parkway stock. Among the terms and conditions contained in the agreement were: (A) The holders of at least 90 percent of the outstanding shares of Parkway stock tender their shares to petitioner under the terms of the exchange offer. If less than 90 percent of the stock was tendered, petitioner had the option of accepting the stock tendered or withdrawing its offer. (B) A ruling be obtained from the Internal Revenue Service that petitioner's acquisition of Parkway stock qualified as a tax-free reorganization under section 368(a)(1)(B). If a ruling was not obtained, either petitioner or Parkway had the option of terminating the exchange. (C) The Board *631 of Governors of the Federal Reserve System shall have approved petitioner's application to acquire the Parkway stock, and all other required governmental approvals shall have been obtained and not withdrawn. (D) A registration statement shall have been declared effective by the Securities and Exchange Commission registering the stock of petitioner to be exchanged for that of Parkway. (E) For accounting purposes petitioner be able to treat the acquisition of the Parkway stock as a "pooling of interests." If it was determined that the acquisition could not be so treated, petitioner had the option of withdrawing its offer. (F) There shall have been no material adverse change in Parkway's financial condition from that set forth in the financial statements which Parkway supplied to petitioner. The agreement also authorized petitioner to examine Parkway's books and records in order to determine whether the conditions above set forth in paragraphs (E) and (F) were satisfied and for purposes of (1) compiling the information needed for preparing the necessary documents required to be submitted to various Government agencies; (2) ensuring that the financial information presented *632 by Parkway was accurate and that there was no undisclosed fact or condition which would adversely affect the financial condition of either petitioner or Parkway, or which would affect the exchange ratio of stock in petitioner for stock in Parkway; and (3) reviewing records required for petitioner's consolidated statements. Subsequent to the agreement of August 21, 1973, petitioner's employees and its independent certified public accountant conducted an examination of Parkway's books and records. In connection therewith, during 1974 petitioner incurred the following expenses: Description
Amount
Office supplies
$ 41.86
Filing fees
100.00
Travel expenses
3,041.58
Accounting expenses
5,894.00
9,077.44
Petitioner deducted these amounts as ordinary and necessary business expenses on its 1974 consolidated income tax return. Other than including them in the list of expenditures, no further evidence was provided concerning the expenditures for office supplies and filing fees. The $ 3,041.58 amount for travel expenses was for the travel of petitioner's employees to Tallahassee, Fla., to examine the books and records of Parkway. Included in this amount were *633 lodging and meal expenses. The $ 5,894 amount for accounting expenses was composed of separate amounts of $ 2,494 and $ 3,400 [3] paid to Peat, Marwick, Mitchell & Co. (hereinafter Peat Marwick), petitioner's independent certified public accountant. On April 18, 1974, Peat Marwick rendered to petitioner a bill which included a $ 2,494 amount for "Professional services rendered in connection with proposed acquisition of Parkway * * *, including travel and other expenses of $ 238." In response to an inquiry by petitioner concerning the $ 2,494 amount, Peat Marwick further explained the amount as follows: Personnel
Hours
Partner
21
Manager
31
Assistant
1
53
Fee at standard
$ 2,820
Realization - 80%
2,256
Travel, typing, Xeroxing
and telephone expenses
228
Total
[4] $ 2,494
*634 The major portion of the manager time was spent in participating and observing Ellis group auditors in the conduct of an examination in July, 1973. In addition, certain procedures were performed with respect to the local CPA's work and Parkway records to enable us to rely on the opinion of the other auditors in the event we deemed it necessary. Certainly in the conduct of any future audit of this bank by us, such time will be of benefit. A portion of the manager time and most of the partner time resulted from research regarding the appropriateness of the use of the pooling of interests method of accounting, review of the Acquisition Agreement in relation thereto and various letters dated November 7, 1973, November 16, 1973, December 5, 1973, January 24, 1974 and February 15, 1974, all in response to your letter of August 29, 1973. Petitioner paid the $ 2,494 amount by check dated August 16, 1974. Although Peat Marwick was requested to do whatever was necessary for petitioner's consolidated statements, it was not specifically asked to observe the audit of Parkway *635 by petitioner's employees. Peat Marwick did so, however, as part of making whatever spot checks and verifications it deemed appropriate in fulfilling its general responsibilities in certifying petitioner's consolidated statements. This action by Peat Marwick was in anticipation of including Parkway in, and of certifying, petitioner's consolidated statements for 1974. As part of the S-1 registration filed with the Securities and Exchange Commission to register the stock petitioner would exchange for the Parkway stock, petitioner was required to submit certain data for 1973 which Peat Marwick had previously certified. Before Peat Marwick consented to the use of its name in connection with the certification of this data, Peat Marwick determined if there had been any material change in the data since the previous certification had been made. On July 31, 1974, Peat Marwick rendered to petitioner a bill in the amount of $ 3,400 for the services rendered in making this determination and in signing the consent on the S-1 registration. Petitioner paid the $ 3,400 amount by check dated August 12, 1974. Ultimately, on July 12, 1975, petitioner acquired all of the stock of Parkway in *636 a nontaxable stock exchange. As a result of the investigation of Parkway's books and records, a downward adjustment was made to the originally agreed upon exchange ratio of petitioner and Parkway stock. Had Parkway not agreed to this downward adjustment, petitioner would have abandoned its plan to acquire the Parkway stock. In the statutory notice of deficiency, respondent determined that no portion of the $ 9,077.44 amount deducted by petitioner was deductible. Such expenses were determined to be part of the cost of acquiring the Parkway stock. OPINION The issue for decision is whether petitioner properly deducted, as ordinary and necessary business expenses under section 162, certain expenditures incurred in connection with the examination of the books and records of the Parkway National Bank of Tallahassee, prior to but incident to the acquisition of Parkway's stock of petitioner in 1975, and in connection with the preparation of necessary documents concerning the acquisition of the Parkway stock required to be submitted to appropriate governmental agencies. The details of these expenditures and the purposes for which they were made are outlined in the Findings of Fact. *637 There is no question that the amounts deducted were in fact expended. In the absence of evidence to the contrary, we must assume that the expenditures for office supplies pertained to supplies used both in examining Parkway's books and records and in preparing the necessary submissions. Similarly, we must assume that the filing fee expenditure was for fees paid when submitting required documents to governmental agencies. The expenditure for travel expenses was for costs incurred by petitioner's employees for transportation, lodging, and meal expenses incurred in examining the books and records of Parkway. The expenditure for accounting services represented two separate amounts, $ 2,494 and $ 3,400, paid to Peat Marwick, petitioner's independent certified public accountant. The principal evidence as to the services provided in return for the $ 2,494 payment was the explanation provided by Peat Marwick in a letter to petitioner. No employee of Peat Marwick testified. Similarly, the principal evidence as to the services provided in return for the $ 3,400 payment was the explanation included on the bill which Peat Marwick tentendered to petitioner. Both explanations are set *638 forth in the Findings of Fact. Petitioner's argument in support of its deduction of the expenditures in issue runs along the following lines. Petitioner contends that it is in the active trade or business of banking, that it conducts its banking business through subsidiary banks, and that an important aspect of its business (as a means of expanding its business into new markets) involves acquiring, managing, and promoting banks. Because of legal restrictions during the period involved on establishing branch banks, other banks were acquired by petitioner as a means of expanding its business into new markets. In determining which banks to acquire, it was necessary to expend funds to investigate the financial condition of potential acquisitions. Such expenditures, petitioner contends, are the type at issue herein and are ordinary and necessary expenses of its banking business. This is true, petitioner argues, notwithstanding that the purchase price of the Parkway stock must be capitalized and that the expenditures were incurred after the offer to purchase was made and the agreement for acquisition was signed. Petitioner explains that because the banking industry practice was not *639 to allow a prospective purchaser to examine the books and records of a to-be-acquired bank in the absence of a contract to purchase, it was first necessary to enter into such a contract before a full investigation was completed and the decision to acquire was made. The prospective purchaser was protected, however, by the many conditions precedent to fulfillment of the contract to purchase. Petitioner contends that this general pattern was followed in petitioner's acquisition of the Parkway stock. Petitioner finally contends that until the many conditions precedent were satisfied or, if waivable, were waived, it reserved its decision whether to acquire the Parkway stock; that the expenditures in issue were incurred prior to the time when this decision was made and were "ordinary and necessary" in making the decision; and that because of such facts they are ordinary and necessary business expenses and not costs incurred in connection with the acquisition of the Parkway stock. [5] In addition and alternatively, petitioner argues that the $ 2,494 portion of the amount paid to Peat Marwick was in connection with Peat Marwick's general responsibility to certify petitioner's financial statements *640 and not in connection with the Parkway stock acquisition. In response to petitioner's arguments respondent contends that the expenditures in question are not deductible under section 162(a) for two reasons: (1) They were not incurred in petitioner's trade or business since a search for or investigation of a business in which to invest is not the "carrying on" of a trade or business within the meaning of section 162(a); and (2) they were incurred in connection with the acquisition of a capital asset, the Parkway stock, and must be capitalized pursuant to section 263 as part of the cost of that asset. As a matter of convenience, we first address petitioner's alternative argument that the $ 2,494 expenditure for accounting services by Peat Marwick is somehow distinct from the other expenditures because it was for services "in connection with Peat Marwick's continuing function of preparing petitioner's financial statements." The argument for separately *641 treating this expenditure is belied by the explanation of the amount provided by Peat Marwick. Included within the services for which the bill was rendered was time spent in researching whether the acquisition of the Parkway stock could be accounted for as a pooling of interests. Although such research may also have been valuable in terms of Peat Marwick's continuing responsibility with regard to petitioner's consolidated financial statements, it appears primarily important with regard to the acquisition of the Parkway stock since petitioner's ability to treat said acquisition under this accounting procedure was a condition precedent to petitioner's offer. Certainly, it cannot be said that the importance of the research to the stock acquisition was only incidental or that the portion of the expenditure related thereto was only incidental. Thus, even if expenditures made for services rendered in connection with any "continuing function" by Peat Marwick could be accorded a different tax treatment than the other expenditures in issue (a question on which we express no opinion), there is no basis for treating the entire $ 2,494 amount as being for such "continuing function" services. *642 Nor is there any factual basis for dividing the $ 2,494 amount. Since petitioner has failed to establish what portion, if any, of the $ 2,494 amount should not be treated as for services in researching the pooling of interest question, we must accordingly proceed as if the entire amount was for such services. There being no argument that services rendered in such research were to be treated any differently than the other items in issue, we will discuss all the amounts together. The tax treatment to be accorded the expenditures in issue involves the interaction of section 162, which allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business," and section 263 which generally precludes a deduction for expenditures capital in nature. The application of section 263 takes precedence over section 162. Secs. 161, 261; Commissioner v. Idaho Power Company,418 U.S. 1, 17 (1974). Respondent's first argument, which he does not press that forcefully, is that the expenditures in question were not incurred in "carrying on any trade or business" since searching for and investigating a business *643 in which to invest is not the carrying on of a trade or business. As a general rule expenditures for searching for and investigating a new business in which to invest are not allowable as deductions under section 162. Abegg v. Commissioner,50 T.C. 145, 153 (1968), affd. without discussion of this issue, 429 F.2d 1209 (2d Cir. 1970), cert. denied 400 U.S. 1008 (1971); Polachek v. Commissioner,22 T.C. 858 (1954); Frank v. Commissioner,20 T.C. 511 (1953); Westervelt v. Commissioner,8 T.C. 1248 (1947). The rationale behind such decisions is the search and investigation is not in and of itself a trade or business and that since the expenditures are for investigating a new business, they are not incurred in a trade or business which the taxpayer is then carrying on. We are not certain that this rationale applies to the facts of the case at bar because of the type of business engaged in by petitioner and the manner of conducting it. See Newark Morning Ledger Co. v. United States,416 F.Supp. 689, 693-695 (D.N.J. 1975), affd. 539 F.2d 919 (3d Cir. 1976). *644 However, we need not decide that argument because we conclude that respondent must prevail on his second argument. Even if these expenditures involved were incurred in carrying on petitioner's trade or business, petitioner must also show that they were "ordinary and necessary" to be deductible under section 162. An expense may be "ordinary" in the sense of "normal, usual, or customary," Deputy v. duPont,308 U.S. 488, 495-496 (1940), in a taxpayer's trade or business, but still not be deductible because it was incurred in the acquisition of a capital asset. Helvering v. Winmill,305 U.S. 79 (1938). The principal purpose of the "ordinary" requirement "is to clarify the distinction, often difficult, between those expenses that are currently deductible and those that are in the nature of capital expenditures, which, if deductible at all, must be amortized over the useful life of the asset." Commissioner v. Teller,383 U.S. 687, 689-690 (1966). As said in Commissioner v. Idaho Power Co.,supra at 17: The clear import of sec. 161 is that * * * an expenditure incurred in acquiring capital assets must be capitalized *645 even when the expenditure otherwise might be deemed deductible under Part VI. [Which includes sec. 162.] Thus the fact that petitioner incurs expenditures such as at issue on a recurring basis does not ensure their characterization as "ordinary" if they are incurred in the acquisition of a capital asset. Woodward v. Commissioner,397 U.S. 572 (1970). Nor would the fact that petitioner was engaged in the business of acquiring bank stock entitle it to deduct such expenditures if the bank stock was a capital asset and the expenditures were incurred in the acquisition thereof. Helvering v. Winmill,supra.As suggested in Woodward v. Commissioner,supra at 577, "the simpler inquiry [is] whether the origin of the claim litigated is in the process of acquisition itself." In United States v. General Bancshares Corporation,388 F.2d 184, 187 (8th Cir. 1968), the court said: Whether expenses are ordinary and necessary and thus currently deductible or are capital in nature and must be added to the cost basis of the capital asset depends on the character of the transaction to which they relate. * * * Generally *646 capital expenditures occur when an improvement or betterment is made to a capital asset (sec. 263 I.R.C.) or an expense is incurred in the purchase or sale of a capital asset or the collection of capital proceeds. There is no dispute that the Parkway stock is a capital asset and petitioner's cost of the stock given in exchange therefor must be capitalized. Nor does petitioner dispute the general proposition that costs, other than merely the purchase price, incurred in the acquisition of a capital asset must also be capitalized. As stated in Woodward v. Commissioner,supra at 576, "The law could hardly be otherwise, for such ancilliary expenses [brokerage, accounting and similar costs] incurred in acquiring or disposing of an asset are as much part of the cost of that asset as is the price paid for it." The narrow question presented herein is whether the expenditures in issue were incurred by petitioner in the acquisition of the Parkway stock or whether, as petitioner contends, because they were incurred as part of petitioner's decision-making process they are ordinary and necessary business expenses. The proper characterization of *647 the expenditures in issue as either ordinary and necessary or capital in nature is a question of fact. Commissioner v. Heiniger,320 U.S. 467, 475 (1943). The only reasonable conclusion which can be drawn from the facts presented is that the expenditures in issue were incurred in connection with the acquisition of a capital asset and must be capitalized as part of the costs of acquiring the Parkway stock. Petitioner owned no interest in Parkway prior to its agreement in 1973 to acquire the Parkway stock. The expenditures in question were incurred by petitioner in fulfilling the necessary preconditions to effecting this agreement. The examination of Parkway's books and records enabled petitioner, inter alia, to prepare the required applications for approval by the necessary Government agencies of the stock acquisition and to determine whether petitioner could treat the acquisition for accounting purposes as a pooling of interests. Approval by the necessary governmental agencies of the stock acquisition was an unwaivable precondition to an actual exchange of stock. Petitioner's inability to treat the acquisition as a pooling of interests would allow petitioner *648 to withdraw its offer. Expenditures made to satisfy these preconditions are so inexorably tied to and such an integral part of the stock acquisition that they must be considered a part of the cost thereof. Similarly, the fee paid to Peat Marwick in connection with the registration with the Securities and Exchange Commission of the stock which petitioner would exchange in the transaction is also an integral part of the stock acquisition. In Woodward v. Commissioner,supra, and United States v. Hilton Hotels Corp.,397 U.S. 580 (1970), the Supreme Court held that litigation expenses, incurred in connection with appraisal proceedings under State law for the valuation of the minority-stockholder's stock which the majority stockholders were obligated to acquire, had their origin in the process of acquiring the stock and had to be capitalized as part of the cost of that stock. The Court considered the appraisal proceedings "no more than a substitute that state law provided for the process of negotiation as a means of fixing the price at which the stock was to be purchased," Woodward v. Commissioner,supra at 578, and that had *649 the costs been incurred by the taxpayer in negotiating a purchase of the stock they would have been capital expenditures. In the instant case, one purpose of the examination of Parkway's books and records was to ensure that the financial information provided by Parkway during the preliminary negotiations was complete and accurate and, thus, that the stock-exchange ratio based on that information was accurate. As it turned out, information developed during the examination required a downward adjustment of the exchange ratio. The expenditures in issue incurred to gauge the fairness of the stock-exchange ratio are as much a part of the cost of acquiring the Parkway stock as were the expenditures in Woodward. See also Beneficial Industrial Loan Corporation v. Handy,16 F.Supp 110 (D. Del. 1936), affd. 92 F.2d 74 (3d Cir. 1937), wherein payments for accounting services to review records of companies to be acquired in order to determine the price to be paid were held to be capital expenditures. It is true, as petitioner points out, that until all the conditions precedent contained in the agreement were satisfied or, where applicable, waived, it had no *650 contractual obligation to acquire the Parkway stock. The success or failure of the acquisition process, however, is not relevant in determining the character of the expenditure. Union Mutual Life Ins. Co. v. United States,570 F.2d 382, 392 (1st Cir. 1978); Radio Station WBIR, Inc. v. Commissioner,31 T.C. 803 (1959). The link between the expenditures in issue and the stock acquisition is not negated by the absence of a contractual obligation to obtain the Parkway stock when the expenditures were incurred. The expenditures were as much a "cost" as was petitioner's cost of the stock it exchanged for the Parkway stock. North Carolina National Bank v. United States, an unreported case ( W.D.N.C. 1978, 42 AFTR2d 78-5866, 78-2 USTC par. 9661), a case cited by petitioner, does not aid its argument. At issue in that case was the deductibility under section 162 of various expenditures incurred by taxpayer-bank in opening a new branch bank. The expenditures involved: (a) Application fees for governmental permission to open a new branch bank and expenses related thereto such as attorney's and consultant's fees; (b) costs for a large-scale *651 geographic study of possible areas in which to open a new branch bank; and (c) allocated internal taxpayer costs for salaries and expenses related to planning bank expansions and in obtaining governmental permission to open a new branch bank. The District Court found that because the offering of banking services from a new location did not reflect entry into a new trade or business, affect taxpayer's capital structure, or create a separate and distinct asset, the expenditures at issue were ordinary and necessary business expenses. This case is most readily distinguishable from the one at bar by the fact that petitioner herein did acquire a separate and distinct capital asset, the Parkway stock. Although petitioner may be correct that the practical effect of the stock acquisition was the same as the opening of a new branch bank, nonetheless, a capital asset was acquired. Thus, the cited case is of no benefit to petitioner. Similarly, York v. Commissioner,261 F.2d 421 (4th Cir. 1958), revg. 29 T.C. 520 (1957), is of no benefit to petitioner. The issue therein was framed in terms of whether the taxpayer's expenditure for a land-development survey *652 was an ordinary and necessary business expense of the taxpayer's business of developing and promoting real estate developments or was a nondeductible expenditure for the purpose of determining whether the taxpayer should enter a new business. Whether the expenditure related to the acquistion of a capital asset or should otherwise be capitalized was not at issue therein. While this case may provide support for petitioner's contention that investigatory expenses incurred to identify new markets in which to expand its business are ordinary and necessary business expenses, it in no way supports the argument that the expenditures in issue were not incurred in connection with the acquisition of a capital asset. See Union Mutual Life Ins. Co. v. United States,supra at 392. In summary, we conclude that petitioner is not entitled to deduct the expenditures in issue under section 162. Even if it was within petitioner's trade or business to acquire the stock of Parkway such would not entitle it to the deduction sought since the expenditures in question were costs incurred in the acquisition of a capital asset and must be capitalized. Helvering v. Winmill,supra. *653 Decision will be entered under Rule 155.
Footnotes
1. In the statutory notice of deficiency, respondent also made an adjustment to petitioner Ellis Banking Corporation's charitable contribution deduction. This adjustment was an automatic result of respondent's other adjustments and of the application of the limitation imposed on charitable contribution deductions by sec. 170(b)(2), I.R.C. 1954. The deduction ultimately allowable can be mathematically determined based on the parties concessions as to some issues and the Court's resolution of the issue pending. Petitioner Ellis Banking Corporation in its petition prays that the Court award it reasonable attorney's fees and expenses pursuant to Pub.L. 94-559, 90 Stat. 2641, Oct. 19, 1976, amending 42 U.S.C. sec. 1988. This Court is without jurisdiction to award to petitioner attorney's fees and expenses connected with this litigation, Key Buick Co. v. Commissioner,68 T.C. 178 (1977), affd. 613 F.2d 1306↩ (5th Cir. 1980). 2. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the taxable year in issue, unless otherwise indicated.↩
3. The parties stipulated that the $ 3,400 amount was paid in connection with the examination of Parkway's books and records. Based on the record before us, infra,↩ it appears that the amount was paid for services rendered in connection with solely reviewing petitioner's financial information. Neither party makes mention of this point, however, and we believe it inconsequential in deciding the issue presented.
4. The correct total for the figures is $ 2,484. There error in no way affects the outcome of the case.↩
5. On brief, petitioner characterizes the expenditures in issue as being "relative" to the acquisition of Parkway but not in "connection" therewith. Rather, the expenditures were in "connection" with its investigation of Parkway.↩