JULIUS NEWMAN and SANDRA E. NEWMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Newman v. Commissioner
Docket No. 9758-78.
United States Tax Court
T.C. Memo 1981-373; 1981 Tax Ct. Memo LEXIS 370; 42 T.C.M. (CCH) 448; T.C.M. (RIA) 81373; July 21, 1981. *370 Ps wished to acquire certain property, and they made a payment to the lessees of the property to avoid litigation over the lessees' claim to possession of the property; Ps also paid legal expenses relating to such payment. Held, such payments had their origin in the acquisition of a capital asset, and therefore, such payments were nondeductible capital expenditures. Mervin M. Wilf, for the petitioners. Louis T. Conti, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined a deficiency of $ 21,573.00 in the petitioners' Federal income tax for 1975. After *371 concessions by the petitioners, the issues for decision are: (1) Whether an amount paid by the petitioners to settle a potential lawsuit was an ordinary and necessary business expense or a nondeductible capital expenditure; and (2) whether legal fees paid by the petitioners in connection with such settlement were an ordinary and necessary business expense or a nondeductible capital expenditure. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Julius and Sandra S. Newman, husband and wife, maintained their legal residence in Narberth, Pa., at the time they filed their petition in this case. They filed their joint Federal income tax return for 1975 with the Internal Revenue Service Center, Philadelphia, Pa.
During 1975, Dr. Newman desired to move his principal offices to a location which was more convenient to his residence and to the hospitals at which most of his professional services were performed. In March 1975, the petitioners were advised by a realtor that property (the property) situated in the desired area and owned by BP Oil, Inc. (BP), was for sale. The asking price for the property was $ 95,000. In March *372 1975, the petitioners entered into an agreement with BP for the purchase of the property for $ 95,000. Such agreement set July 1, 1975, as the settlement date. However, such agreement provided that the petitioners would not be required to purchase the property unless and until the property had been vacant for 30 days and free of any claims for possession by any tenant, trespasser, or occupier. The petitioners, as equitable owners of the property, were granted the right to maintain any action, at their own cost and expense, to cause the removal of any tenant, trespasser, or occupier. Such agreement also provided that in the event neither BP nor the petitioners could obtain possession of the property within 90 days after the date such agreement was executed, such agreement was to be null and void. An addendum to such agreement granted the petitioners an additional 90 days to remove the present tenant if, within the original 90-day period, such tenant was not removed from the property. In March 1975, the property was occupied by two individuals, Pasquale Murgidi and Leonard Rabin (the lessees). Since 1967, the lessees had operated a BP service station on the property under a "lease *373 agreement" with BP. In 1972, BP gave notice to the lessees that it was terminating its agreement with them, but they refused to vacate the property. In April 1973, BP began an eviction action in the Philadelphia Municipal Court to evict the lessees from the property. Judgment in such action was rendered in favor of BP. In May 1973, Mr. Murgidi filed a notice of appeal to the Court of Common Pleas. In response to such notice of appeal, BP filed a complaint in ejectment in the Court of Common Pleas. The lessees counterclaimed, contending that despite the form of the "lease agreement," there existed a franchisor-franchisee relationship between themselves by BP without cause. At the time the petitioners entered into the agreement with BP, they knew of the ongoing litigation between BP and the lessees. After the agreement with BP was executed, the petitioners' attorney referred them to Barry E. Ungar, an attorney who specialized in commercial litigation. Mr. Ungar was of the opinion that had the petitioners gone to settlement with BP, although they had no obligation to do so which the litigation between BP and the lessees was in progress, they would have been sued by the lessees. *374 Accordingly, Mr. Ungar negotiated a settlement agreement between the petitioners and the lessees, where in consideration of the petitioners paying the lessees $ 35,000, the lessees agreed to vacate the property and to convey, by quitclaim deed, all their right, title, and interest in the property to the petitioners. Such settlement agreement was executed on July 29, 1975, and pursuant to such settlement agreement, the petitioners paid $ 35,000 to the lessees. The petitioners paid Mr. Ungar $ 2,080 for his services. On the same day that such settlement agreement was executed, the petitioners purchased the property from BP for $ 95,000. On March 2, 1976, the Court of Common Pleas issued its order and final decree in favor of BP. Subsequent to the issuance of such order and decree, BP entered into a settlement wherein consideration of Mr. Murgidi foregoing any right of appeal, BP agreed to release its claim to back rent. On their 1975 return, the petitioners reported gross income from the property of $ 21,686 and claimed expenses of $ 46,649. Included in such expenses were "Legal and Accounting" expenses consisting of the $ 35,000 the petitioners paid to the lessees and the $ *375 2,080 paid to Mr. Ungar. In his notice of deficiency, the Commissioner disallowed such "Legal and Accounting" expenses on the ground that such expenses were made to perfect or defend the title to the property and, therefore, were nondeductible capital expenditures. OPINION The parties agree that the legal theory for determining whether the petitioners' payments to the lessees and to Mr. Ungar were ordinary and necessary business expenses, currently deductible under section 162 of the Internal Revenue Code of 1954, [1] or whether such payments were capital expenditures, nondeductible under section 263, is the "origin of the claim" test. However, the parties disagree on the factual question of what was the origin of the claim. Under the origin of the claim test, the origin and character of the claim with respect to which a settlement liability is incurred governs the tax character of such liability. United States v. Hilton Hotels Corp., 397 U.S. 580 (1970); *376 Woodward v. Commissioner, 397 U.S. 572 (1970); Anchor Coupling Co. v. United States, 427 F. 2d 429 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971); Redwood Empire Savings and Loan Assoc. v. Commissioner, 68 T.C. 960 (1977), affd. 628 F. 2d 516 (9th Cir. 1980). Such test requires that our inquiry be "directed to the ascertainment of the 'kind of transaction' out of which the litigation arose. * * * Consideration must be given to the issues involved, the nature and objectives of the litigation, the defenses asserted, the purpose for which the claimed deductions were expended, the background of the litigation, and all facts pertaining to the controversy." Boagni v. Commissioner, 59 T.C. 708, 713 (1973); see also Entwicklungs Und Finanzierungs A.G. v. Commissioner, 68 T.C. 749 (1977); Newark Morning Ledger Co. v. United States, 416 F. Supp. 689 (D. N.J. 1975), affd. 539 F. 2d 929 (3d Cir. 1976). If such inquiry reveals that a settlement payment was incidental to the process of acquiring a capital asset or to resolving a claim which arose *377 in the process of acquiring a capital asset, regardless of the taxpayer's subjective motivation for agreeing to the payment, such payment constitutes a nondeductible capital expenditure. Clark Oil & Refining Corp. v. United States, 473 F. 2d 1217, 1220-1221 (7th Cir. 1973); Anchor Coupling Co. v. United States, supra; EntwicklungsUnd Finanzierungs A.G. v. Commissioner, supra; Arthur H. DuGrenier, Inc. v. Commissioner, 58 T.C. 931, 938 (1972). The petitioners maintain that the origin and character of the claim underlying their settlement payment with the lessees and their payment to Mr. Ungar for his services in connection with such settlement was not to acquire the property, but to avoid the litigation that was certain to ensue if they purchased the property from BP. They argue that we must focus on the claim of the lessees and that such claim was based on the original franchise. The Commissioner concedes that if such payments had their origin solely in the avoidance of litigation, such payments would be ordinary and necessary business expenses. However, he contends that such payments were made *378 to obtain whatever rights to possession the lessees had in the property and that therefore the origin of the claim was in the acquisition of a capital asset. The petitioners' contention ignores the context in which their settlement with the lessees arose. Under the terms of the purchase agreement, the petitioners were not obligated to purchase the property from BP so long as the lessees were in possession of the property. The petitioners could have simply "walked away" from the purchase agreement. It is true that the lessees' claim to possession was based on an alleged franchise agreement, but the petitioners were not required to become involved in any controversy with the lessees; if the petitioners did so, it was because they wanted the property. The title to the property which could be acquired from BP would not serve their purpose; they needed the right to possess it as well. In addition, the purchase agreement granted the petitioners, as the equitable owners of the property, the right to bring an action, at their own expense, to evict the lessees. Unless and until the petitioners either brought such an action or purchased the property, they would not have been sued by *379 the lessees. Faced with the option of postponing the settlement date for the purchase of the property and possibly losing the opportunity to purchase the property altogether, the petitioners elected to settle with the lessees and acquire whatever interest the lessees had in the property. In effect, such settlement was in lieu of bringing an eviction action and is analogous to a payment to remove a lessee in order to accelerate possession. Such a payment constitutes an additional cost of acquiring property. See Thalhimer Brothers, Inc. v. Commissioner, 27 T.C. 733, 739 (1957); Ashlock v. Commissioner, 18 T.C. 405, 413 (1952). [2]
The petitioners cite two cases, Newark Morning Ledger Co. v. United States, supra, and Entwicklungs Und Finanzierungs A.G. v. Commissioner, supra, in support of their contention that expenses incurred to avoid litigation are currently deductible. However, both cases merely stand for the principle that if the origin of the claim underlying the litigation is the preservation *380 of a non-capital asset, rather than the acquisition of a capital asset, the expense of such litigation is currently deductible. Also, in Entwicklungs Und Finanzierungs A.G., we further held, relying on Anchor Coupling Co. v. United States, supra, that the portion of a settlement payment allocable to the extinguishment of a claim to a capital asset is a nondeductible capital expenditure. Under these circumstances, we find and hold that the origin of the claim underlying the petitioners' settlement was the acquisition of the property, not its operation. Accordingly, the settlement payment made to the lessees and the payment to Mr. Ungar for his services in connection with such settlement were capital expenditures, nondeductible under section 263. See Clark Oil & Refining Co. v. United States, supra; Anchor Coupling Co. v. United States, supra; Redwood Empire Savings and Loan Assoc. v. Commissioner, supra; Entwicklungs Und Finanzierungs A.G. v. Commissioner, supra; Arthur H. DuGrenier, Inc. v. Commissioner, supra.As such, the petitioners are entitled *381 to increase their basis in the property by $ 37,080 and, for 1975, may also be entitled to an additional deduction for depreciation with respect to the property. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during 1975.↩
2. See also American Spring & Wire Specialty Co. v. Commissioner, T.C. Memo. 1961-26↩.